## STONE *vs.* COOPER.

The defendant who was the editor of a newspaper owed the plaintiff money upon an award of arbitrators; in speaking of which and of the plaintiff in an article in his paper he said, *the money will be forthcoming on the last day allowed by the award, but we are not disposed to allow him to put it into Wall-street for shaving purposes before that period;* HELD not libellous.

A declaration for libel stated by way of inducement that there were vague reports in circulation that the plaintiff had done something disreputable and disgraceful to his character in connection with breaking or causing to be broken a lock or locks for the purpose of taking on execution money in the possession of one

A. M. B., and then set forth a publication by the defendant in relation to money which he owed the plaintiff in which it was said " there will be no locksmith necessary to get at the ready," which the declaration averred referred to the reports and was intended to charge the plaintiff with having done something disgraceful; *held* insufficient, and that the substance of the reports should have been stated.

On error from the supreme court. Cooper sued Stone in the court below for *libel.* The declaration alleged that on the 17th June, 1842, an award was made pursuant to a submission to arbitration between the parties, by which the defendant was ordered to pay to the plaintiff $300 in sixty days from the time of making the award; and also that before the publication complained of "various, and oftentimes vague and inconsistent statements and representations had been made and circulated of and concerning the said plaintiff, to the effect that he the said plaintiff had done something disreputable and disgraceful to his character in connection with breaking or causing to be broken a lock or locks for the purpose of taking on execution money in the possession of one Andrew M. Barber, insomuch that it was generally known and understood by and amongst the neighbors of the plaintiff and other good and worthy citizens of the United States, that the aforesaid statements and representations had been made and circulated of and concerning the said plaintiff." Yet the said defendant well knowing &c., to wit, on the sixth day of July, 1842, to wit, at &c. in a newspaper called the New-York Spectator, falsely &c. published the false, malicious and defamatory libel of and concerning the plaintiff and of and concerning the aforesaid sum of money directed by the aforesaid award to be paid by the defendant to the plaintiff, and of and concerning the aforesaid statements and representations concerning the said plaintiff, to wit, &c. The publication omitting the innuendoes is as follows: "Mr. J. Fennimore Cooper need not be so fidgety in his anxiety to finger the cash to be paid by us towards his support. It will be forthcoming on the last day allowed by the award, but we are not disposed to allow him to put it into Wall-street for shaving purposes before that period. Wait patiently. There will be no locksmith necessary to get at the ready." The first count concluded with an averment that

Stone *v.* Cooper.

by the expression relating to the *locksmith* the defendant refer-
red to the statements and representations before mentioned, and
intended to insinuate that the said plaintiff had done something
disgraceful to his character in connection with breaking or
causing to be broken a lock or locks for the purpose of taking
on execution money in the possession of Andrew M. Barber.

There was a second count on the same publication which
was like the first except that the concluding averment was
omitted. The defendant demurred to each count, assigning
special causes of demurrer, and the plaintiff joined in demurrer.
The court below gave judgment for the plaintiff; upon which
he sued out a writ of inquiry, and his damages were assessed at
$250, for which with the costs the plaintiff had judgment, and
the defendant brought error to this court.

The following opinion sets forth the reasons of the supreme
court:

COWEN, J. The nature of the story concerning the lock, is
not stated in the inducement: therefore, although the allusion
to it, at the conclusion of the article, may be sufficiently charged,
it cannot be regarded as rendering the clause libellous. The
story should have been stated, that it might be seen on the record
to have been discreditable. The whole is in effect, averring no
more, than that the defendant has said something disgraceful
of the plaintiff, without showing what it was. That would be
ill pleading.

Both the first and second counts, therefore, must stand, if at
all, on the same ground, viz. that the article is libellous, *per se.*

The publication in question represents the defendant as anx-
ious to get the money speedily, for the purpose of using it in
shaving. To shave, with money, imports, in common parlance,
the lending it on usury, or making unfair purchases with it; in
short, availing one's self of others' wants, to obtain an advan-
tage, and make an unconscientious profit. To shave is, in one
sense, "to strip, *to oppress, by extortion, to fleece.*" ( *Web. Dict.*
" *shave,*" *pl.* 6.) It is "to strip, to oppress by extortion, to pillage."
(*John. Dict. " to shave,*" *pl.* 5.) To charge a man with sha-

ving *by his money,* fixes the word with an obvious moral sense. The libel perhaps implies that the plaintiff was in the habit of shaving: at least, that he was anxious to use the particular sum for that purpose.

The charge of a vice, or of a vicious propensity, in a particular instance, is libellous. It is holding a man up to the scorn of society in general. (*Holt on Libels,* 221, *N. Y. ed. of* 1818.)

*M. S. Bidwell & J. A. Spencer,* for the plaintiff in error. 1. The statements and representations referred to in the introductory part of the declaration should have been set forth to enable the court to judge whether the allusion to them in the publication was libellous. (*Miller* v. *Maxwell,* 16 *Wend.* 9.) 2. The publication, properly understood, does not impute to the plaintiff the intention of using the money payable to him on the award for *shaving purposes.* 3. But if it did it would not be libellous. The words "for shaving purposes in Wall-street" mean in their popular sense no more than the purchasing of securities offered for sale for a less amount than that payable by them. The article is obviously playful and innocent. 4. There is no difference in reason and principle between written and oral slander; the same rules should be applied to both, and where words if spoken would not be actionable, an action should not be sustained upon them, if written. (*Thorley* v. *Kerry,* 4 *Taunt.* 355.)

*Richard Cooper,* for the defendant in error 1. The introductory averments are sufficient to give application to that part of the publication alluding to the *locksmith.* Taken together they shew that dishonorable conduct was imputed to the plaintiff. 2. That part of the publication relating to *shaving* is clearly libellous. It imports a charge against the plaintiff below of being addicted to shaving practices, or of having the reputation of a shaver. Such a charge is libellous. *To shave* means to oppress by extortion. In libel words are now to be understood in their most obvious and probable sense and in that in which men in general would understand them. After verdict or upon demurrer,

which admits the malice, they should be understood in **their** worst sense.

THE CHANCELLOR.   The action in this case was for an alleged libel, and the only question presented for consideration is whether the publication was in fact libellous when taken in connection with the extrinsic facts stated in the declaration. The learned judge who delivered the opinion of the supreme court was unquestionably right in supposing that the averment in the declaration as to the vague statements and representations in circulation relative to the breaking of a lock were wholly insufficient to give point and meaning to the part of the defendant's publication which stated that there would be no locksmith necessary " to get at the ready." The substance, at least, of the false representation which had previously been made against the plaintiff, to which these words in the defendant's publication are supposed to allude, should have been stated in the declaration; so that the court could determine, as a matter of law, whether the publication in question would be libellous if the defendant intended to convey the impression to the public that he believed those representations to be true. Nor is there any thing in the part of the publication which alludes to money awarded by the arbitrators as cash that was to be paid, by the defendant, *for the plaintiff's support,* which renders that part of the publication libellous. Although we may have heard from the public papers, or otherwise, what was the real subject in controversy before the arbitrators, and that the reputation of the plaintiff as a correct and impartial naval historian was triumphantly sustained by their decision, we cannot as a court take judicial notice of the fact, nor look beyond this record for the purpose of ascertaining the nature and meaning of this part of the alleged libel. The declaration is entirely silent as to the nature of the controversy upon which the award of the arbitrators had directed a sum of money to be paid, by the defendant, to the plaintiff in this suit. The natural inference, therefore, from the language of the publication in connection with the averments in the declaration, in the absence of any other information on the subject,

would be that the defendant was under some legal or equitable obligation to the plaintiff to pay him the $300 for his support, and that the arbitrators had by their award directed the payment of that money within a specified period, which had not expired at the time of the publication of the alleged libel. Giving this natural construction to the language of the publication, in connection with the averments, there is nothing in that part of the publication which was calculated to degrade the character of the plaintiff in the public estimation, or even to wound the feelings of a gentleman. And if the plaintiff supposed the defendant intended by this publication to induce the public to believe that the plaintiff was in the habit of instituting and prosecuting libel suits for the mere purpose of obtaining money as a means of obtaining a support, he should in his declaration have stated the nature of the controversy in reference to which the award was made; and should also have accompanied that statement with the averment of such other facts as would be necessary to enable the court to give such a construction to the language of the publication. Whether this part of the publication could have been made libellous by any averments of extrinsic facts and circumstances, it is not necessary now to determine. It is sufficient to say it is not libellous *per se ;* and that there is nothing in the declaration which can authorize the court to say it was calculated to injure the character of the plaintiff, or to degrade him in the public estimation. It therefore only remains for me to consider whether the intimation in the publication, that the plaintiff either desired or intended to put the money, which had been awarded to him, into Wall-street for shaving purposes, was in itself libellous.

Scarcely any two elementary writers or even judges agree as to the proper definition of a libel, either as applied to public officers, or as to the trade or business of the person libelled; or as applied simply to the character or standing in society of the individual against whom a false charge is made by the libeller, and without reference to any office, trade, business, or employment, which may be affected by the alleged libel. In the case under consideration, it is not stated in the declaration that the plaintiff

Stone *v. Cooper.*

held any official situation, nor that he was engaged in any particular business or employment which might be presumed to be injuriously affected in consequence of the publication of the defendant. If this publication is to be deemed libellous, therefore, upon the facts stated in this record, it would be equally libellous if published in reference to the humblest citizen of the state. I cannot agree, however, with the counsel for the plaintiff in error, that no written publication concerning a mere private individual, and without reference to any particular business or employment in which he is engaged, can be sufficient to sustain an action for damages unless the nature of the charge is such that it would have been sufficient to sustain an action for mere verbal slander. It is true Sir James Mansfield, in delivering the opinion of the court of exchequer chamber in the case of *Thorley* v. *Kerry*, (4 *Taunt.* 364,) inclines to repudiate the distinction between verbal and written slander, as the foundation of an action for damages merely, and says that if the question was the first time to be decided, he should have no hesitation in saying that no action could be maintained for written scandal which could not have been maintained for the same words if they had been spoken; but he admits that the law as settled and established by some of the ablest judges in England is otherwise. And the judgment of the court in the case then under consideration was made in accordance with the settled law on that subject. Still it is not every false charge against an individual, even when the same is deliberately reduced to writing and published to the world, which is sufficient to sustain a private action to recover a compensation in damages as for a libel. Some publications are deemed libellous so as to render the authors thereof liable to be punished criminally, in consequence of their tendencies to disturb the public peace, although no private injury will probably result to any one from such publications. Such are the cases of libels upon the dead, whereby the feelings of surviving relatives may be deeply wounded; the consequences of which would probably be attempts to inflict summary justice upon the authors of such libels if the laws had not provided the more peaceful remedy of a resort to a criminal prosecution. But to

sustain a private action for the recovery of a compensation in damages for a false and unauthorized publication, the plaintiff in such action must either aver and prove that he has sustained some special damage from the publication of the matter charged against him; or the nature of the charge itself must be such that the court can legally presume he has been degraded in the estimation of his acquaintances or of the public, or has suffered some other loss either in his property, character, or business, or in his domestic or social relations, in consequence of the publication of such charge. Where from the nature of the charge, therefore, in connection with other facts stated in the plaintiff's declaration, no such injury or loss will necessarily or even probably result to him in consequence of the publication of such charge, he cannot recover damages as for a libel, without averring and proving that special damage has been in fact sustained by him in consequence of the publication of the false and unfounded charge.

The word *shave* certainly is sometimes used to denote the act of obtaining the property of another by oppression and extortion; that is by taking an inequitable and unconscientious advantage of his situation to fleece or strip him of his property. And if there was any thing in the publication under consideration from which it could be fairly inferred that the defendant meant to charge, or to induce the public to believe that the plaintiff had been guilty of such extortion and oppression, I should not hesitate to pronounce the publication libellous. For the belief that he had been guilty of such misconduct would be very likely to injure his reputation as an honest man and a good citizen, and to expose him to public hatred and contempt. Such, however, is not the natural sense in which those who read this publication would be likely to understand it. For the word shave is also used to denote the buying of existing notes and other securities for money at a discount beyond the nominal amount of the debt and interest due or to become due on such notes or securities. And this court has decided that shaving of that description is a legitimate and legal business, and does not come either within the letter or spirit of the usury

laws; although the vendee takes from the seller a guaranty for the collection of a sum equal to the purchase money and legal interest thereon, and with the right to retain for his own use all he can collect, upon the securities purchased beyond that amount. (*Cram* v. *Hendricks*, 7 *Wend. R.* 569; *Rapelye* v. *Anderson*, 4 *Hill's Rep.* 472.) And certainly it cannot be libellous *per se* to charge that a citizen has actually been engaged in a business which the highest judicial tribunal in the state has declared to be neither improper nor illegal; and which is not considered by the public, either as dishonest or disreputable. It is this kind of shaving operations, in which money, placed in the great money mart of the United States for the purpose of being used in shaving, is generally understood to be employed; while that odious and disgraceful kind of shaving which consists in fleecing individuals of their property by overreaching, extortion, and oppression, is practised by unworthy and unconscientious men in all parts of the state. The fair and legitimate meaning of the intimation in the publication under consideration therefore was, that the plaintiff either wished or intended to put the three hundred dollars awarded to him by the arbitrators, into the hands of some one in Wallstreet to be employed in the legitimate and profitable business of buying up securities at a discount; as the most respectable brokers in Wall-street are in the constant habit of doing. For these reasons I think the court below erred in giving to the language of the defendant's publication an unnatural and odious meaning, not warranted by the term *shaving* in the connection in which it was used; and that the defendant was entitled to judgment upon the demurrer to the plaintiff's declaration. I shall therefore vote to reverse the judgment of the supreme court.

PORTER, Senator. The plaintiff in the introductory part of his declaration states, that there were various vague and inconsistent statements circulated in connexion with breaking locks, but gives no particular account of what those statements were. He says they were disgraceful to his character. But in what

Stone v. Cooper.

respects disgraceful, or how they affected his character, he has not furnished the court with the means of knowing. We cannot take his conclusion from the statements; but must first know what they are, and then judge whether a publication alluding to them, would be libellous. Besides, how is the defendant to know with precision, to what the declaration refers? and unless he is told he cannot be in any situation to plead. In this respect it is altogether too loose and indefinite to constitute good pleading.

Upon the second branch of his case, the plaintiff below assumes that the publication charges him with the habit or practice of using his money in shaving. This assumption is, I think, unfounded. There is no such idea suggested by the language used, unless we allow ourselves to imagine that one who receives money will probably use it in a way to indicate the manner in which he had been in the habit of using money before that time. This is too fanciful and far fetched a construction, to be legitimately used in this case. Neither is there any direct charge that if he had the money, he would use it in shaving; nor is there any necessary implication to be derived from the language used, that he would thus use the money. Nor is there even a probability implied to that effect. At most there is implied a possibility, and a hint that it might be thus used. Such is the extent and the whole extent of the publication claimed to be libellous. Suppose the language had been, "we will not pay him until we are required to by the award, for he may put it into Wall-street for shaving purposes." I apprehend that no court would construe such language to be libellous, if they would the direct charge of shaving; for it imputes no habit or practice of thus using money. But is saying that "we are not disposed to allow him to put it into Wall-street for shaving purposes," any stronger mode of expressing a habit, or more distinctly charging a practice upon another, than to say "he may do it?" If so it is too refined for my appreciation, and too subtle for all practical purposes in respect to the law of libel. The right of action for a libellous publication should have a better defined and more intelligible foundation

than this to stand upon. I am not aware of any decided case in which the action has been sustained upon a charge so indefinite and intangible; and which merely implied the possibility of an act, the direct charge of which might leave a doubt, whether it would be libellous. It will not add, I think, to the reputation of the courts, to be found sustaining the effort to multiply the instances in which this action may be brought. In my judgment courts should not be very willing to encourage this remedy, for every trifling assault upon private character. A reference to the rule laid down as a guide to determine when the action lies, and a comparison of the case before the court with such rule, will enable us to judge whether the demurrer in this cause is well taken.

Holt, in his Law of Libel, (p. 223,) says, "Every thing written of another, which holds him up to scorn and ridicule, that might reasonably be considered as provoking him to a breach of the peace, is a libel." And again, "All such written abuse as may fairly be intended to impair him in the enjoyment of society; or throw a contempt upon him which might affect his general fortune and comfort, is a positive injury, and therefore the subject of an action on the case." These rules carry the right of action, I apprehend, as far as the law will warrant. Let us then see whether they sustain this suit. To publish of one that I would not pay him money before it was due, "for I was not disposed to allow him to put it into Wall-street for shaving purposes," could hardly be said with propriety "to be holding him up to scorn and ridicule, that might reasonably be considered as provoking him to a breach of the peace." And if it should be considered any kind of abuse to make such a publication, it would fall far short of that "abuse which might be fairly intended to impair him in the enjoyment of society; or throw a contempt upon him which might affect his general fortune and comfort." When brought to this proper test, I am unable to perceive that the publication comes within any established rule, defining what shall be deemed libellous. I therefore think that the supreme court should have given judgment

for the defendant below upon the demurrer; and that their judgment should be *reversed.*

BOCKEE, HARD and BEERS, Senators, also delivered written opinions in favor of reversal.

BARLOW, Senator. The averments are not sufficient to shew precisely what was intended by the allusion to *the locksmith* contained in the publication complained of. The only question therefore is, whether the article is actionable without reference to these averments.

If the publication imputes to the plaintiff any criminal offence, or an offence against good morals or any thing which is injurious to his character, or which would tend to affect his good standing in society, it is libellous. Our laws regard character and reputation as valuable possessions, and profess to afford them protection against the assaults of the malicious. This is quite consistent with that freedom of speech and of the press which all regard as sacred and inviolable. Public journalists have no peculiar exemption from the general rules of law on this subject, and are liable for injurious publications in precisely the same cases in which individuals in other professions or employments would be. If a licence were granted to them to attack without regard to truth and with impunity, the character and conduct of their fellow citizens, it must be extended indiscriminately to all; and the absence of all responsibility for such assaults would lead to consequences the most disastrous to the whole frame of society.

The expression in the publication complained of " We are not disposed to allow him" to put the money we owe him " into Wall-street for shaving purposes," has a very intelligible meaning in the minds of men in general. It would unquestionably be understood to allude to the practice of purchasing evidences of debt at great and oppressive discounts, a business justly odious and plainly derogatory to an honorable and manly character. One who has justly acquired the reputation of a *shaver* is universally regarded with dislike and suspicion by all well balanced

minds and in all well regulated communities.  To impute such a character falsely to another in a written publication is therefore libellous.   The whole scope of the publication shews that it was intended to attach that imputation to the plaintiff.   Hence the remark that the defendant intended to withhold the *cash* until "the last day allowed by the award."   True, he could legally thus withhold it, but the intention to do so is not put upon that ground, but is imputed to the reluctance which the writer felt to having it prematurely afford the means for carrying on the immoral or illegal business of shaving.   If the defendant did not mean to convey the idea that the purposes for which he indicated that the money was ultimately to be employed were odious and immoral, there would be no point in the remark about withholding it.   I conclude therefore that the article imputes to the plaintiff a disposition or an intention to do an immoral if not a criminal act.

The remark that "there will be no locksmith necessary to get at the ready," hints at some highly improper if not felonious manner of getting money, the disposition to use which in case of necessity is imputed to the plaintiff.   I shall not speculate in order to ascertain whether the words may not by possibility refer to some innocent or harmless matter.   The language is to be taken in its most easy and natural sense, and it is enough if it imputes either crime or some conduct the belief of which would be injurious to the plaintiff's character.   No one can doubt but that the remark was intentionally offensive and provoking ; and one who will indulge in such a kind of writing is not entitled to the exercise of ingenious speculation in order to see if some sense cannot be discovered which would screen him from legal animadversion.   The defendant's counsel have made an able and elaborate argument with a view to shew that *crime* must necessarily be imputed in order to constitute a publication libellous, and that the same rules apply to written which govern in the case of verbal slander.   But this is not so in reason and upon principle, nor is the law justly chargeable with such inconsistency.   Verbal imputations, however gross, may die with the breath which sent them forth, and be forgotten with the excitement of the occasion which produced them.   But written or

printed charges of the same import remain permanently upon the record, and by means of the press are multiplied and sent abroad through the world as far as the name or fame of the injured individual may extend to destroy his character and embitter his feelings through his whole life, and even to degrade his memory in the estimation of those who may come after him. The distinction stands on a broad and rational foundation, and should not therefore be subverted unless we are compelled to do so by precedents bearing directly upon the question. But we are under no necessity to do this, for the distinction has been long recognized and acted upon and seems to be firmly established.

In my opinion, therefore, the judgment should be affirmed.

On the question being put, "Shall this judgment be reversed?" the members of the court voted as follows:

*For reversal:* The PRESIDENT, The CHANCELLOR, and *Senators* BACKUS, BEEKMAN, BEERS, BOCKEE, BURNHAM, CHAMBERLAIN, DENNISTON, DEYO, EMMONS, HARD, LOTT, PORTER and SEDGWICK—15.

*For affirmance:* *Senators* BARLOW, HAND, JOHNSON, JONES and SMITH—5.

Judgment reversed.