(91 App. Div. 259.)

### TRIGGS v. SUN PRINTING & PUBLISHING CO.

(Supreme Court, Appellate Division, First Department. February 11, 1904.)

1. LIBEL—ARTICLES LIBELOUS PER SE—RIDICULE OF OPINIONS.

An article published of an instructor in a university, ridiculing his opinions and criticisms on literary topics, is not libelous per se, either on the theory that it exposes him to ridicule or that it tends to injure him in his profession.

Laughlin, J., dissenting.

Appeal from Special Term, New York County.

Action by Oscar L. Triggs against the Sun Printing & Publishing Company. From a judgment overruling a demurrer to the complaint, defendant appeals. Reversed.

The libelous articles complained of are as follows:

### "TRIGGS IN ALTRURIA.

"Prof. Oscar Lovell Triggs, of the University of Chicago, is the brightest jewel in Dr. Harper's crown. Who doesn't know and venerate Triggs? Triggs, the hammer of hymn writers, the scourge of Whittier and Longfellow, the panegyrist of Walt Whitman, who wrote of him in a still unpublished poem:

"'I love young Oscar, a wind of the Northwest, full of vigor, cheek, and elan.'

"For some months Prof. Triggs was collecting and comparing names for his baby. The baby was named at last, redeemed from anonymity; and the proud father once more had leisure to brood beneficently over the university and the universe. We have waited, not always with true philosophic patience, for the unfolding of his new thought. We knew that he would not leave the world barren for long. To quote Walt once more:

"'Frequent, iterant, dripping, and persistent like rain, regular as taxes, a stayer.'

"And now the god has spoken. At the Cook County League of Women's Clubs, Saturday, Prof. Triggs looked into the seeds of time, and had a vision of the 'new man.' Hear and tremble, miserable homunculus of to-day:

"'The business man of the future would not be recognized by the business man of to-day. The present order of man will pass away. There shall come a new humanity. Notice the passing of patriotism, which is merely an expanded egotism. Notice the new state of diplomacy. All this points to the new era when the social spirit will prevail; when the selfish, the egotistic motive will be gone. The business man will wish to share his successes with the rest of society.'

"We hate to differ with Prof. Triggs, but his remarks about patriotism are reported incorrectly, or there is some kink in his definition. If patriotism is expanded egotism, what is Triggs? If Triggs and patriotism are one, how can patriotism 'pass'? We are ready to believe in the 'new humanity' and to welcome it; but what is new humanity without the same old and ever young Triggs? Insisting that Triggs must and shall be preserved, let us cast an admiring glance at the business man of the future. He will share his successes with the rest of society? It would be Philistine to call for a bill of particulars. The new business man will divide his profits among his customers or among the whole community. The individual dividends may not be large, but they will show a kindly spirit in the divider. Presumably, the customers or the community will consent to be assessed in case the business loses money. Let altruism have its perfect work. It may be hard for a thoroughly new business man to resist the temptation to give his goods away.

"As for Triggs and all other altruistic professors of the Chicago University, they will pay Dr. Harper for the privilege of working for him. Already some of them delight to prepare for the new order by giving themselves away."

The foregoing is taken from the New York Sun of March 2, 1903.

"The news that Professor Oscar Lovell Triggs, of the University of Chicago, may appear as a theatrical advance agent, will give joy to every friend of higher education in America. Such a dazzling promotion for Professor Triggs must at once make college teaching more attractive to ambitious young men. Hitherto the complaint has been that the pay is small, and the work leads to nothing more. A young man who might have been a lawyer, with an income ranging from $8,000 upwards, with a prospect of a seat on the bench, or perhaps a brilliant political career, might reasonably have hesitated before becom-

ing a professor with an income of $3,000 or $4,000 at the utmost, and no brass bands and skyrockets. But Professor Triggs has blazed the way to new glories. For years he has been showing his colleagues that a professor of mettle can himself be both a brass band and a skyrocket. And now a theatrical manager offers him the exceeding great reward of $700 a week to travel ahead of a play called 'Romeo and Juliet,' placing the stamp of professional approval upon this production of a hitherto unknown author, and assure the good people of Indiana and Illinois that, in his way, Shakspere is the equal of Gen. Lew Wallace, or even Professor William Cleaver Wilkinson, of the University of Chicago. This is fine, and all the more so because, if Professor Triggs keeps on developing, he will inevitably become the whole show himself."

The foregoing is taken from the New York Sun of April 6, 1903.

### "TRIGGS AND ROMEO.

"To men of good liver, life is full of happiness. To us it is, and long has been, one of the greatest of these felicities to guide amateurs to Prof. Oscar Lovell Triggs, a true museum piece, and the choicest treasure in Dr. Harper's collection. We cannot boast of having discovered Triggs, for he was born great, discovered himself early, and has a just appreciation of the value of this discovery. But in our humble way we have helped communicate him to the world, assisted in his effusion and diffusion, and beckoned reverent millions to his shrine. We have joyed to see him perform three heroic labors, viz.:

"1. 'Knock out' old Whittier and Longfellow.

"2. 'Do up' the hymn writers.

"3. Name his baby at the end of a year of solemn consultation.

"But these achievements are only the bright beginning of a long course of halcyon and vociferous proceedings. As yet, Prof. Triggs is but in the bud. He came near blossoming the other day, and the English drama would have blossomed with him. A firm which is to produce 'Romeo and Juliet' offered him $700 a week to be the 'advance agent' of the show and to 'work up enthusiasm by lecturing.' Prof. Triggs was compelled to decline the offer, but the terms of his refusal show that it is not absolute, and that 'some day,' as the melodramas cry, he will illuminate Shakespeare, dramatic literature, and the public mind:

" 'I regret my inability at this time to take advantage of this opportunity, for the plan proposed seems to me to be an excellent one. I would regard it, from my point of view, as an educational opportunity. It would gratify me to be able to present my views on drama, on Shakespeare, and on this particular play to audiences that would gather together from a serious interest in the drama itself. This would be a form of "university extension" not hitherto tried, and which should be attended with good educational results, such as I would desire, and such also as I assume you would desire.'

"The nap is worn off the phrase 'university extension.' What Prof. Triggs proposes and the country hungers for is 'Triggs' extension.' He must not give up to Chicago what was meant for mankind. His views on any subject are impressive; but on Shakespeare they would be as authoritative and final as it is his genius to be. As we have watched him swatting Whittier and Longfellow, we have felt like yelling,

" 'What, art thou drawn among these heartless hinds?'

"The professor should take a man more nearly of his size. The Shakespeare legend should be allowed to delude no more. Prof. Triggs can be depended upon to reduce this man Shakespeare to his natural proportions, club the sawdust out of that wax figger of literature, and preach to eager multitudes the superiority of the modern playwrights with all the modern improvements. The so-called poetry and imagination visible in this Stratford charlatan's plays must be torn out—deracinated, the fellow would call it, in his fustian style. If these plays are to be put upon the stage, they must be rewritten; and Prof. Triggs is the destined rewriter, amender, and reviser. The sapless, old-fashioned rhetoric must be cut down. The fresh and natural contemporary

tongue, pure Triggsian, must be substituted.  For example, who can read with patience these tinsel lines?

" 'Madam, an hour before the worshipped sun
'Peered forth the golden window of the east,
'A troubled mind drave me to walk abroad.'

"This must be translated into Triggsian, somewhat like this:

" 'Say, lady, an hour before sunup I was feeling wormy, and took a walk
around the block.'

"Here is more Shakesperian rubbish:

" 'O, she doth teach the torches to burn bright!
'Her beauty hangs upon the cheek of night,
'As a rich jewel in an Ethiop's ear.'

"How much more forcible in clear, concise Triggsian:

" 'Say, she's a peach! a bird!'

"Hear 'Pop' Capulet drivel:

" 'Go to, go to,
'You are a saucy boy.'

"In the Oscar dialect this is this:

" 'Come off, kid!  You're too fresh.'

"Compare the dropsical hifalutin:

" 'Night's candles are burnt out, and jocund day,
'Stands tiptoe on the misty mountain's tops.'

—with the time-saving Triggsian version:

" 'I hear the milkman.'

"The downfall of Shakespeare is only a matter of time and Triggs.  Carnegie ought to endow Triggs.  Oscar Hammerstein ought to dramatize Triggs. Triggs is the hope, and soon will be the pride, of the stage.  He ought to have not less than $7,000 a week for fifty-three weeks a year."

The foregoing is taken from the New York Sun of April 10, 1903.

The complaint sets forth that the plaintiff is a professor of English at the University of Chicago, at Chicago, Ill., and that the defendant's newspaper is widely circulated throughout the United States.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, INGRAHAM, and LAUGHLIN, JJ.

Franklin Bartlett, for appellant.
Otto T. Hess, for respondent.

INGRAHAM, J.  The action is for a libel.  There is no special damage alleged, and by a demurrer to the complaint the defendant raises the single question as to whether the article published concerning the plaintiff is libelous per se.  The plaintiff, in his complaint, alleges that he was, and still is, "and at all times hereinafter mentioned and for more than seven years last past has been, an instructor or teacher in the department of English at the University of Chicago, in the city of Chicago, state of Illinois, and was duly practicing his profession at the said University of Chicago"; that he was also engaged in lecture and extension work in connection with the University of Chicago, and in private lecturing and writing on literary subjects, since his association with the University of Chicago, in 1892; that he "had always, as such private docent and instructor in the department of English of the University of Chicago, and as such lecturer and writer on literary subjects, conducted himself with honesty, fidelity, and

dignity, and had never been guilty, nor suspected to have been guilty, of any incompetency or inability, nor that he was ill-fitted or poorly qualified to occupy his position as an instructor in the University of Chicago, or as a lecturer and writer; that he had never been guilty, nor suspected to have been guilty, of sensationalism, dishonesty, or infidelity in the performance of his duties in his said capacity or profession as a teacher, lecturer, and writer, or as instructor in the department of English in the University of Chicago; that, prior to the publication thereinafter set forth, plaintiff had enjoyed a wide reputation for honesty, uprightness, integrity, fidelity, dignity, competency, and ability"; that, in the performance of his duties as instructor in the department of English in the University of Chicago, he was assigned to the "presentation of certain ideas and of the conduct of a certain line of work in literature in the classroom; that, in his lectures before the said students, he was assigned to the work of dealing with current English literature, and particularly with the poets Longfellow, Whittier, Emerson, Holmes, Garland, and others; that plaintiff was the Professor Oscar Lovell Triggs referred to therein, who conducted the said lectures; and that, in the presentation of his ideas and of his work, the said plaintiff acted under the direction of, and as an assistant and subordinate to, the head of the department of English of the University of Chicago."

We are not told in the complaint what particular ideas the plaintiff presented or promulgated respecting the poets named, but the writer of the article has seen fit to criticise what he understood to be the plaintiff's ideas of poetry in general, and of certain poets named. The plaintiff objects to the article published, as tending to expose him to ridicule and contempt, and to impair his usefulness as a teacher in the university in which he is an instructor. There is nothing in these articles which can possibly be construed as charging the plaintiff with a crime or disgraceful conduct, or any act which would subject him to the contempt of the community. The articles are written and plainly intended to be understood as humorous, and not serious. They are filled with exaggerations as to what the author considers to be the result of the application of the ideas of the plaintiff to certain poems specified. But that the spirit of exaggeration and fun pervading these articles was not intended seriously, nor to be taken as seriously charging the plaintiff with any misconduct or lack of professional ability, is quite clear; and however much fun is made of the teachings of the plaintiff, and their effect, as understood by the writer of the articles, there is nothing in any of them that can be taken as a serious charge against the plaintiff, or as subjecting him to contempt. The plaintiff has taken this publication too seriously, and has considered what was intended to amuse the readers of the paper as a serious criticism upon his work, which it seems to me a study of these articles does not warrant. We are not unmindful of the definitions of what constitutes a libel per se, and that, in general terms, it is the rule that every publication which charges or imputes to any person that which renders him infamous, odious, or ridiculous is libelous; but, so far as I know, an article which makes an opinion pronounced by a teacher ridiculous has never been held libelous. There is certainly a distinction between

a publication which tends to make the individual infamous, odious, or ridiculous, and a publication which relates to a person's opinions upon topics of public interest.   Certainly in no case to which our attention has been called has it ever been held that a publication which tends to ridicule opinions upon controverted subjects is libelous, as tending to make the individual who is responsible for those opinions ridiculous. There is nothing here said of the plaintiff which could tend to impair his character as a gentleman, or as a competent teacher of English; and no one reading this article would for a moment understand that the writer intended anything but to make fun of such opinions as it was supposed the plaintiff, in his public character as a teacher, had promulgated.

Nor do I think this article can be construed as a publication which would tend to injure the plaintiff in his profession, occupation, or business.   There is nothing in the article that criticises the teachings of the plaintiff; nothing that alleges that he is incompetent to teach the English language to students in the University; and, so far as I can see, nothing from which any one would infer that the writer wished to intimate that the plaintiff was not an entirely competent and distinguished professor of the institution with which he was connected.   The whole article was written to ridicule certain ideas for which it was understood the plaintiff was responsible.   No published work of his is criticised; no lectures that he has delivered to his classes are held up to ridicule; and this is nothing more than an extreme criticism of a public lecturer and writer who has criticised the writing of others. The article certainly tends to make the ideas with which the plaintiff is charged ridiculous, but there is nothing charged against him which makes him, as a man, infamous, odious, or ridiculous.

In Stone v. Cooper, 2 Denio, 293, Chancellor Walworth, in the Court of Errors, said:

"But to sustain a private action for the recovery of a compensation in damages for a false and unauthorized publication, the plaintiff in such action must either aver and prove that he has sustained some special damage from the publication of the matter charged against him, or the nature of the charge itself must be such that the court can legally presume he has been degraded in the estimation of his acquaintances or of the public, or has suffered some other loss, either in his property, character, or business, or in his domestic or social relations, in consequence of the publication of such charge.   Where, from the nature of the charge, therefore, in connection with other facts stated in the plaintiff's declarations, no such injury or loss will necessarily or even probably result to him in consequence of the publication of such charge, he cannot recover damages as for a libel, without averring and proving that special damage has been in fact sustained by him in consequence of the publication of the false and unfounded charge."

I think, therefore, that this article cannot be said to be libelous per se, and, as no special damage is alleged, the complaint does not state facts sufficient to constitute a cause of action.

It follows that the judgment appealed from must be reversed, with costs, and the demurrer sustained, with costs, with leave to amend the complaint upon payment of costs in this court and in the court below.

VAN BRUNT, P. J., and McLAUGHLIN and HATCH, JJ., concur.

LAUGHLIN, J. (dissenting). By the demurrer it is admitted that the articles are false, and that they were published maliciously, as charged in the complaint. I am of opinion that the publications are libelous, as maliciously ridiculing the plaintiff, and holding him up to public derision and contempt, both in his private and professional life, and also upon the ground that they tend to injure him in his profession and calling.

In People v. Croswell, 3 Johns. Cas. 353, "libel" is defined as "a censorious or ridiculing writing, picture, or sign, made with a mischievous intent towards government, magistrates, or individuals." The law has frequently been declared by the courts of this state that a malicious writing or publication which subjects an individual to public ridicule or contempt is libelous per se. Steele v. Southwick, 9 Johns. 214; Shelby v. Sun Printing & Publishing Ass'n, 38 Hun, 474, affirmed in 109 N. Y. 611, 15 N. E. 895; Gates v. N. M. Recorder Co., 83 Hun, 614, 31 N. Y. Supp. 1127, affirmed in 155 N. Y. 228, 49 N. E. 769; McFadden v. Morning Journal Ass'n, 28 App. Div. 508, 51 N. Y. Supp. 275; Morey v. Morning Journal Ass'n, 123 N. Y. 207, 25 N. E. 161, 9 L. R. A. 621, 20 Am. St. Rep. 730; Thomas v. Smith, 75 Hun, 573, 27 N. Y. Supp. 589; Gray v. Sampers, 35 App. Div. 270, 55 N. Y. Supp. 3; Morrison v. Smith, 83 App. Div. 206, 82 N. Y. Supp. 166. Publications which were much less likely to injure have been declared libelous per se in other states, on the ground that they subjected the injured party to public ridicule. Hatt v. Evening News Ass'n, 94 Mich. 114, 53 N. W. 952; McMurry v. Martin, 26 Mo. App. 437; Buckstaff v. Viall, 84 Wis. 129, 54 N. W. 111.

These articles, all of the same general nature and tendency, were published in the Sun on the 2d day of March, and on the 6th and 10th days of April, respectively, 1903. At those times the plaintiff was an instructor in the department of English in Chicago University, under an appointment for one year, commencing in the fall of 1902, which would expire within a few months. He had been connected with that University since it was founded, in 1892. He was first appointed a private docent in the department of English, and held this position for three years. He was then regularly appointed an instructor in the department of English for three years, at the expiration of which time he was reappointed for a like term. Since then he has been reappointed from year to year. The plaintiff has also been engaged in lecture and extension work in connection with the university, and in private lecturing and writing on literary subjects, during all this time. He alleges that he was competent, and that he has performed the various duties in a dignified manner, under the direction of, and as an assistant to, the head of the department of English. The articles are something more than fair criticisms of the plaintiff's literary style and method of teaching. The exaggeration is so great that they portray him in a ridiculous light. They represent him as apparently in disaccord with the literary men of present and past ages, and convey the impression that, in teaching and lecturing, he, with much ardor and earnestness, contends that the poetry and prose that have long been accepted by literary critics and professors of English as standards of English poetry and writing are utterly unworthy the place accorded them. They rep-

resent the plaintiff's method of teaching and style as illiterate, uncultivated, coarse, and vulgar, and his ideas as sensational, absurd, and foolish. They also represent him as egotistical and conceited in the extreme, and convey the impression that he makes himself ridiculous both in his method of instruction and by his public lectures. They also ridicule his private life, by charging that he was unable to select a name for his baby until after a year of solemn deliberation. In short, they, in effect, represent him as a presumptuous literary freak. If these representations concerning his personal characteristics, his ideas of the standard authors of English prose and poetry, and his literary style and method of teaching, are true, it necessarily follows that he is unfit, for lack of dignity and learning, to hold a position as instructor in English literature in any college or university. If the defendant was at liberty to publish these articles, then every newspaper in the United States and elsewhere enjoyed a like privilege, in the absence of statutory prohibition. It needs no argument, I think, to show that, if the press generally persisted in publishing articles of this character concerning the plaintiff, his ability to earn a livelihood in his chosen profession would be seriously jeopardized or impaired, if not destroyed. The good of the university might require those in authority to dispense with his services, as the only means of holding its patrons. Those who believe the publications will hold the plaintiff in contempt for thus presuming to crticise the universally accepted poets and authors, and for promulgating such ideas as a teacher of English in a university, and to those to whom he is known he will become the butt of ridicule. Presumably, he is qualified to hold the position, or the university would not have retained his services so long; and his qualifications, being alleged, are admitted by the demurrer. If, as claimed by counsel for the appellant, these articles were written in a spirit of fun and friendship, the writer did not display ability of as high an order in determining that they would not be injurious to the plaintiff as he shows literary merit in the composition. I am of opinion that these publications overstep the just bounds of freedom of the press, and that the publication of such comments and criticisms with immunity is not required by any rule of public policy. The defendant, if it cannot justify, should be compelled to make restitution by way of damages in such an amount as a jury, in the exercise of sound discretion, under proper instructions from the court, may award. It should not be permitted to afford its writers and readers fun and amusement of this nature at the expense of the plaintiff.

I regard the articles as plainly libelous per se, and am of opinion that the interlocutory judgment should be affirmed, with costs.