### RUSTGARD v. TROY et al.

(First Division.   Juneau.   April 2, 1921.)

No. 2000–A.

**Libel and Slander** ⬤�longrightarrow6(1)—Officers—Pleadings.

     Plaintiff was a candidate for Attorney General of Alaska by popular election. The defendant newspaper printed an editorial article accusing him of belonging to a faction of his party, and of speaking egotistically of himself in public, and criticized him for both matters. Plaintiff brought this action for libel, and, on demurrer to the complaint, *held*, that neither charge tended to bring upon plaintiff anything of public contempt, or ridicule, or scorn, but were merely newspaper humor, and not actionable when said of a candidate for public office.

The plaintiff brings an action for $20,000 compensatory damages and $5,000 punitive damages against the defendants on account of an alleged false and libelous article which was published in the Alaska Daily Empire on the 8th of September, 1920, concerning the plaintiff while he was a candidate for the office of Attorney General of the territory of Alaska; he having been duly nominated as the regular Republican candidate for that office, to be voted upon at the general election to be held in the territory on the 2d of November, 1920.

The defendant Empire Printing Company is a corporation, and the defendant John W. Troy is alleged to be an officer of said company and the manager and editor of the said newspaper.

Plaintiff alleged that he and his family have been residents of Juneau, Alaska, for more than 11 years and he has been engaged in the general practice of the law.

The article in question, together with plaintiff's allegation as to the meaning thereof, is as follows:

          "Honest John.

     " 'Word comes from Petersburg that John Rustgard, Wickite candidate for Attorney General, in a speech at that place said his conduct had been so exemplary, since he became a resident of Gastineau Channel, that he was known at Juneau as "Honest John."

     " 'That reminds us of the old advice to watch the man who needs to have his virtues labelled. Sometimes these labels are originally bestowed in sarcasm.'

⬤⟹See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"Meaning thereby that the said plaintiff was not the candidate of the Republican party, but of some other party or faction, and that at the public political address in support of the Republican ticket delivered by the said plaintiff at Petersburg, Alaska, on or about the 28th day of August, 1920, the said plaintiff stated in said public address that his conduct had been so, exemplary since he became a resident of Gastineau Channel that he was known at Juneau as 'Honest John,' all of which statements were then and there absolutely false and were published without cause or excuse."

The plaintiff then alleges that the article was published maliciously to injure, defame, and annoy plaintiff and his family, and for the purpose of. making him and his family objects of contempt and ridicule, and for the purpose of injuring plaintiff's business and preventing his election to the office of Attorney General of the territory of Alaska.

Plaintiff further alleges that by reason of such malicious publication he and his family have been "greatly annoyed, and plaintiff has been greatly injured in his standing in the community and throughout the country, and by reason of the publication of said malicious, false, scandalous, and defamatory article will continue for a long time in the future to be greatly annoyed and injured."

John Rustgard, of Juneau, for plaintiff.

H. L. Faulkner and John R. Winn, both of Juneau, for defendants.

BROWN, District Judge. Defendants interpose a general demurrer to the complaint, and this demurrer has been submitted to the court without argument.

"Libels affecting the character of private persons may be classified according to their objects:

"I. Libels which impute to a person the commission of a crime.

"II. Libels which have a tendency to injure him in his office, profession, calling or trade.

"III. Libels which hold him up to scorn and ridicule, and to feelings of contempt or execration, impair him in the enjoyment of general society, and injure those imperfect rights of friendly intercourse and mutual benevolence which man has with respect to man."

Newell on Slander and Libel (3d Ed.) p. 72.

"Libels on Official Persons and Candidates for Office.

"While it cannot be said that the law upon this subject is very well settled in the United States, it seems clear that, when a man consents to be a candidate for a public office conferred by the elec-

tion of the people, he must be considered as putting his character in issue so far as it may relate to his fitness and qualifications for the office, and publications of the truth on this subject, with the honest intention of informing the people, are not libels. It would be unreasonable to conclude that the publication of truths which it is the interest of the people to know should be an offense against the law. For the same reason the publication of falsehood and calumny against public officers or candidates for public offices is an offense most dangerous to the people and deserves punishment, because the people may be deceived and reject the best citizens, to their great injury."

Newell on Slander and Libel (3d Ed.) p. 93.

The only portion of the publication complained of by plaintiff is the first paragraph thereof, wherein it is first alleged "that the use of the word 'Wickite' means that plaintiff was not the candidate of the Republican party, but of some other party or faction."

It is unnecessary for the court to pretend that it is in ignorance of matters which are of common knowledge to every one in this country, viz. that the word "Wickite" refers to James Wickersham, who for more than 20 years last past has been holding high office representing the territory of Alaska, formerly as United States District Judge and more recently as delegate in Congress from Alaska. Those who are the political supporters of Mr. Wickersham have sometimes been referred to as "Wickites." I cannot see that there is anything of contempt or ridicule or scorn in this designation, but it is merely one of those things which in American politics seems to have been adopted in a spirit of newspaper humor or facetiousness.

In regard to the remaining portion of the first paragraph of which the plaintiff complains, to wit, that he stated in his public address at Petersburg that "his conduct had been so exemplary since he became a resident of Gastineau Channel that he was known at Juneau as 'Honest John,'" and which the plaintiff says is false, that is, he did not make any such statement, I am unable to see that this statement, whether it was made or not by the plaintiff, subjects him to any scorn or contempt or ridicule or that he or his family could be injured or damaged thereby, or that the statement is defamatory or libelous. Indeed, if no worse aspersions were made in newspapers during the heat of a political campaign, it would

be very fortunate. It is easy to understand that the management of the said newspaper, being on the opposite side politically from the plaintiff in said campaign, was not looking for complimentary things to say of him, and as a matter of dignified and courteous journalism might have refrained from speaking at all lightly of the plaintiff and his candidacy, but surely this is a very mild case of political abuse, and I am unable to see how the plaintiff could have been damaged in the least thereby, either in his business as an attorney or in his candidacy for the office of Attorney General, or in his standing, socially or otherwise, in the community. And again, not pretending to be in ignorance of what is public knowledge and public record, the plaintiff on the 2d day of November, 1920, was elected to the office of Attorney General for the territory of Alaska as the regular Republican nominee by a very considerable majority and is now holding that high office.

As to the last paragraph in said article, wherein the writer is reminded of some old adage, it does not seem to me that this is made at all as a charge or accusation against the plaintiff, but more as a quip or gibe which in American journalism seems to be looked upon as justifiable to relieve the paper of the charge of being dull or tame. While this practice may not be altogether commendable, it is somewhat a matter of taste, and I am still of the opinion that it falls far short of being a libel within the legal meaning of that term.

"Every citizen has a right to comment on those acts of public men which concern him as a citizen of the state, if he do not make his commentary a cloak for malice and slander. Those who fill a public position must not be too thin-skinned in reference to comments made upon public men which they knew from the bottom of their hearts were undeserved and unjust; yet they must bear with them and submit to be misunderstood for a time, because all knew that the criticism of the press was the best security for the proper discharge of public duties." Newell, Slander and Libel (2d Ed.) p. 577.

I do not see where malice can be inferred from the publication of the article in question. It is true it might be deemed as ill-natured or sarcastic, still I cannot see, as a matter of law, where the article can be held grave or serious enough to be deemed a libel, so that malice would be presumed or inferred as a matter of law.

"The expression of the defendant's opinion that the plaintiff as a member of the Legislature is of such a disposition, wavering in

mind, and open to change his course from improper motives .and inducements, is not actionable without averment and proof of special damages. It is one of the infelicities of public life that a public officer is thus exposed to critical, and often to unjust, comments; but these, unless they pass the bounds of what the law will tolerate, must be borne for the sake of maintaining free speech.

"In the various cases which have been cited to us, or which have come under our observation, where, under such circumstances, actions have been maintained, the words have been considered to contain a charge of positive misconduct. Such, for instance, were Wilson v. Noonan, 23 Wis. 105; Powers v. Dubois, 17 Wend. 63, and Littlejohn v. Greeley, 13 Abb. Pr. 41."

Sillars v. Collier, 151 Mass, 50, 23 N. E. 723, 6 L. R. A. 680.

While in the case at bar there is a bare allegation of special or punitive damages for which $5,000 is claimed, there is nothing specifically or particularly alleged more than in the statement or claim for general damages, and, as stated before, I am unable to conceive how the plaintiff could show the loss of a single friend or the loss of any one's esteem or respect or support, either financially or otherwise, by reason of the statements contained in said published article.

In the case of Stewart v. Minnesota Tribune Co., 40 Minn. 101, 41 N. W. 457, 12 Am. St. Rep. 696, the alleged libel being that "he (a professional man) has moved his office to his house to save expense," the court says:

"We are unable to say that the trial court erred in sustaining the demurrer to the complaint. It is not every false charge against an individual, though reduced to writing, and maliciously published, that will sustain an action for damages. It must appear that the plaintiff has sustained some special loss or damage following as the necessary or natural and proximate consequence of the publication, or the nature of the charge itself must be such that the court can legally presume that the party has been injured in his reputation or business, or in his social relations, or has been subjected to public scandal, scorn, or ridicule, in consequence of the publication. Stone v. Cooper, 2 Denio, 299; Cooley, Torts (2d Ed.) 241–243; Townsh. Sland. & Lib. 121; Pol. Torts, 207–211. Assuming that the charge was maliciously made, it did not import anything unlawful, disreputable, or unprofessional. A professional man has a perfect moral and legal right to change the location of his office to his house,. in his discretion, for any reason satisfactory to himself, whether to save expense or otherwise. What ground is there then for the legal inference that the plaintiff has been degraded and injured by the publication? It is not claimed that the charge as published would tend to injure him, because the change or the report of a change of his office would diminish his profes-

sional business in amount or profits, and no case is made for special damages. 3 Bl. Comm. *124; Terwilliger v. Wands, 17 N. Y. 60, 72 Amer. Dec. 428–433.

"But it is claimed that the words 'to save expense' are, under the circumstances set forth in the complaint, susceptible of a defamatory, meaning, such as would be calculated to injure plaintiff in his private and professional character and standing in the community, and occasion loss or damage in consequence thereof. But we do not think such inference is warranted, or that the injury complained of could be reasonably construed or contemplated as the natural and proximate consequence of the publication, giving the language used its proper and legitimate interpretation; and the charge itself cannot be expanded or enlarged by simple averment. Donaghue v. Gaffy, 53 Conn. 51, 2 Atl. Rep. 397; Platto v. Geilfuss, 47 Wis. 493; Homer v. Engelhardt, 117 Mass. 540; Stone v. Cooper, supra; Walker v. Tribune Co., 29 Fed. Rep. 829. The allusion to the plaintiff in the article complained of may be conceded to be impertinent, and in bad taste; but the law of libel, however salutary as a remedy in proper cases, cannot be invoked to redress every breach of good morals or good manners in newspaper publications respecting individuals."

In the case of Nichols v. Daily Reporter Co., 30 Utah at page 77, 83 Pac. at page 574 (3 L. R. A. [N. S.] 339, 116 Am. St. Rep. 296, 8 Ann. Cas. 841), the court says:

"Some authorities say, whether a publication is libelous per se is to be determined wholly by the sense in which the same is usually understood. Others, that it is to be determined by whether the article is susceptible of but one construction, and that one of harmful meaning; that is to say, if the article is susceptible of two meanings, one innocent and the other harmful, it is not libelous per se. Again, expressions are found in the cases that, if a colloquium or innuendo is necessary to render the language libelous, it is "not per se libelous. Still another test, and the one which we think is the correct one, and which is supported by the greater weight of authority, is, 'when language is used concerning a person or his affairs which from its nature necessarily must, or presumably will, as its natural and proximate consequence, occasion him pecuniary loss, its publication' is libelous per se. Townshend (4th Ed.) §§ 146, 147; Fry v. McCord Bros., 95 Tenn. 680, 33 S. W. 568. 'The nature of the writing must be such that the court can legally presume' that the plaintiff has been damaged. 18 Am. & Eng. Enc. L. (2d Ed.) 916. 'From some sorts of false report the law presumes conclusively that damage has followed, and the plaintiff need neither allege nor prove it. Here the language is styled libelous per se. * * * Except where this presumption exists, special damages to the plaintiff's reputation must be alleged and proved to have been the actual and natural result of the language used.' McLoughlin v. Am. Cir. Loom Co., 125 Fed. 204, 60 C. C. A. 87. This prin-

ciple is also recognized and well stated in Pratt v. Pioneer Press Co., 35 Minn. 251, 28 N. W. 708."

I do not see that any damage whatever, general or special, has been caused the plaintiff as the natural or proximate consequence of this publication.

The demurrer will have to be sustained.

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes