## BARRON V. SMITH.

1. The fact that a person's name was not mentioned in a publication alleged to be a libel on him does not render it the less libelous, so long as the publication would be understood to refer to him.

2. In an action for libel, the question whether the publication referred to plaintiff, whose name was not mentioned in it, is for the jury.

3. It is not necessary, in order to render a publication libelous, that it should charge any crime or public offense, inasmuch as Civ. Code, § 29, defines "libel" as a false and unprivileged publication, by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.

4. A publication alleged that a piano had been sold to a certain miners' union, which required great financiering, and that the agent thought it a great thing to bribe a committee or officers so as to sell a piano, and that such was the case    Held, in an action for libel by the president and one of the trustees of the miners' union, that the publication imported that plaintiffs and others were bribed to purchase the particular piano, and was an actionable libel, without any showing of special damages.

(Opinion filed Decemeber 21, 1904.)

Appeal from circuit court, Lawrence county; Hon. W. G. RICE, Judge.

Action by John Barron against Seth R. Smith. From an order overruling a demurrer to a complaint, defendant appeals. Affirmed.

*Thos. L. Redlon* and *Martin & Mason*, for appellant.

*Joseph B. Moore*, for respondent.

CORSON, P. J. This is an appeal from an order overruling defendant's demurrer to the plaintiff's complaint. The action is for libel, and the only question presented is as to whether or not the complaint states facts sufficient to constitute a cause of action. The allegations of the complaint are, in substance, as follows: That the plaintiff is a resident of Lead City, and president of the Lead City Miners' Union, an organization containing about 1,000 members, and that the defendant is engaged in the furniture business in said city, and includes in said business the sale of pianos. That prior to the 1st day of June, 1903, the plaintiff, together with two other persons, trustees of the said Lead City Miners' Union, were authorized to purchase a piano for the use of said union, and during the month of May they purchased for the use of said union, from one A. McGill, a piano, for the stipulated price of $350, and made a full report thereof to the said union. That the plaintiff prior to the time mentioned in the complaint had always maintained a good reputation and credit, and had never been guilty of any fraud, deceit, or any of the offenses charged against him in the publication hereinafter set forth. That the usefulness of the plaintiff as president of the said union depended largely upon his good reputation and credit,

and upon the personal trust reposed in him by the members of said union and the public generally. That on the 1st day of June, 1903, maliciously intending to expose the plaintiff to hatred, contempt, ridicule, and obloquy, and to cause the plaintiff to be shunned and avoided, and maliciously intending to injure the plaintiff in his occupation and official position in connection with the said union, the defendant did maliciously compose and publish, over his own name, concerning the plaintiff, in the said Lead Daily Call, the false and defamatory matter following, to-wit: "Communicated. Editor Call: I notice in Friday's issue that 'Victory Had Crowned' a piano man, and that he had sold a piano to the Lead City Miners' Union. This was a great victory, and required great financiering, and the best piano made in the world. Well, the world has slipped a cog if that is the best in the world. I do not suppose that the man knows any better, anyhow. He thinks it a great thing to bribe a committee or officers so as to sell a piano. I know that was the case, and also that he tried to bribe a committee to sell a piano to the Degree of Honor. Furthermore, I have been told about one of the ex trustees to the Union getting that fine center table for his influence for a relation when he was in office. Mr. Editor, you may think it is a great accomplishment, but some call it bribery. Respectfully, S. R. Smith." That the plaintiff was thereby exposed to hatred, contempt, and ridicule, and was shunned and avoided by residents of said town of Lead and by the members of said union, and was injured in his occupation. That the defendant published said article with intent to charge this plaintiff with having accepted a bribe from said A. McGill, and being thereby influenced and induced to purchase said piano

from him, with the further intent to cause it to be believed that the plaintiff was dishonest, and had wronged and cheated the said union, and was unworthy to fill the position of president of the same.   And plaintiff prays judgment for damages in the sum therein specified.   Of course, for the purpose of this decision, the allegations stated in the complaint must be assumed to be true.

It is contended by the appellant (1) that the alleged libel does not name any person; (2) that there is no statement in the alleged libel that any committee or officer paid more for the piano than it was worth, by reason of being bribed; (3) that the alleged libel does not charge a crime or any public offense.

"Libel" is defined in the Civil Code of this state as follows: "Libel is a false and unprivileged publication by writing, printing, picture, effigy or other fixed representation to the eye which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Section 29, Civ. Code.   This section is a verbatim copy of section 29 of the Civil Code proposed by the commissioners of the state of New York, and the commissioners evidently intended to embody in the section the common law as laid down in the following authorities referred to in their note to the section: 2 Kent, Comm. 17; Steele v. Southwick, 9 Johns. 214; Cooper v. Greeley, 1 Denio 347; Stone v. Cooper, 2 Denio 293.   The case of Cooper v. Greeley, supra, may be regarded as the leading case upon the subject of libel in New York; and, as the questions presented are very fully considered and discussed in that case, we deem it proper to quote at some length from the opinion, to enable us to give a proper construction to the section.   The

court, in its opinion in that case, says: "The inquiry is, how is this publication to be understood? It is the duty of the court, in an action for a libel, to understand the publication in the same manner as others would naturally do. The construction which it behooves the court of justice to put on a publication which is alleged to be libelous is to be derived as well from the expressions used, as from the whole scope and apparent object of the writer." Certainly in the case at bar the article would be understood by the residents of Lead City as referring to the president and trustees of the miners' union. The fact, however, that no name was mentioned in the article, does not render it the less libelous, so long as it would be understood to refer to the officers who were authorized to purchase the piano. There is no merit, therefore, in the contention that the plaintiff was not specifically named in the article. But whether or not the article referred to the plaintiff is a question for the jury. In speaking of that subject, that court says: "The question whether the alleged libel was published of and concerning the plaintiff, and whether the true meaning of the words is such as is alleged in the innuendo, or not, is a question of fact, which belongs to the jury, and not to the court, to determine." The court in the opinion further says: "The proposition of the defendant's counsel, that, to render a publication actionable, it must impute a crime, cannot be sustained. This rule has never been extended to libels in this state, nor has it been in England for the last one hundred and fifty years. The first action for a libel found in our books of reports is that of Riggs v. Denniston [3 Johns. Cas. 205, 2 Am. Dec. 145], before cited, which was decided in 1802. The late chancellor (then Mr. Justice KENT), delivering the opinion of this court,

observed that the charges against the plaintiff were clearly libelous, because they threw contumely and contempt upon him in his character as a commissioner of bankruptcy, instead of holding them actionable as subjecting the plaintiff to the loss of his office. And such has been the doctrine of this court from that time to the present." In Van Ness v. Hamilton, 19 Johns. 349, Mr. Justice SPENCER said: "It may, however, be observed, in the outset, that there exists a decided distinction between words spoken and written slander. To maintain an action for the former cause, the words must either have produced a temporal loss to the plaintiff, by reason of special damage sustained from their being spoken, or they must convey a charge of some act criminal in itself, and indictable as such, and subjecting the party to an infamous. punishment, or they must impute some indictable offense, involving moral turpitude. To maintain an action for a libel, it is not necessary that an indictable offense should be imputed to the plaintiff. If a libel holds a party up to public scorn, contempt, and ridicule, it is actionable." It is insisted by the defendant's counsel that in the early stages of the law of libel there was no distinction between written and verbal slander, and that no action could then have been maintained for any words written for which an action could not be maintained if they were spoken. The case of Thorley v. Lord Kerry, 4 Taunt. 355, decided in the Exchequer Chamber in 1812, is, among other cases, relied on to sustain that position. Sir J. Mansfield, C. J., in delivering the opinion of the court, stated that the words, had they merely been spoken, would not have been actionable; and, while he disproved of the distinction which he admitted had prevailed for more than a century past between written and spoken scan-

dal, he said that as the rule and distinction had been so firmly established by some of the greatest names known to the law, and from a time at least as far back as the time of Charles II, he could not venture to lay down at that day that "no action could be maintained for any words written for which an action could not be maintained if they were spoken." The court then quotes with approval the following from Starkie on Slander, vol. 1, p. 169: "Upon the whole, it may be collected that any writings, pictures, or signs which derogate from the character of an individual, by imputing to him either bad actions or vicious principles, or which diminish his respectability and abridge his comfort by exposing him to disgrace and ridicule, are actionable without proof of special damage; in short, that an action lies for any false, malicious, and personal imputation effected by such means, and tending to alter the party's situation in society for the worse." And the court concludes: "It does not appear * * * that individual character is more than adequately protected by the legal remedies, civil and criminal, which the law, as it has been established for the last century and a half, both in England and in this country, affords. If this court were competent to repudiate a distinction so well settled as that between written and spoken scandal, public policy would * * * interpose to prevent it." It will be noticed, by section 30 of our Code, that this distinction between libel and slander has been preserved.

It is further contended by the appellant that assuming that the language of the alleged libelous article was intended to apply to the plaintiff as president of the miners' union, and one of the committee authorized to purchase the piano, still the charge made against him is not of such a character as to con-

stitute a libel, without averments of special damage, and that therefore the complaint does not state facts sufficient, in any event, to constitute a cause of action. This contention, in our opinion, is untenable. In Stone v. Cooper, decided by the Court of Errors of the state of New York, 2 Denio 293, referred to by the commissioners, that court, speaking through Chancellor WALWORTH, in discussing the question of what constitutes a libel per se, uses the following language: "But to sustain a private action for the recovery of a compensation in damages for a false and unauthorized publication, the plaintiff in such action must either aver and prove that he has sustained some special damage from the publication of the matter charged against him, or the nature of the charge itself must be such that the court can legally presume he has been degraded in the estimation of his acquaintances or of the public, or has suffered some other loss, either in his property, character, or business, or in his domestic or social relations, in consequence of the publication of such charge. Where, from the nature of the charge, therefore, in connection with other facts stated in the plaintiff's declaration, no such injury or loss will necessarily or even probably result to him in consequence of the publication of such charge, he cannot recover damages as for a libel without averring and proving that special damage has been in fact sustained by him in consequence of the publication of the false and unfounded charge." Tested by the rule laid down in that case, we are of the opinion that it does affirmatively appear from the alleged libelous article that the court might properly presume that the plaintiff was degraded in the estimation of his acquaintances and members of the miners' union and the residents of Lead City by reason of the charge

made. And it will be further observed that the plaintiff avers that such was its effect, and this is admitted by the demurrer.

It will be noticed that the language used in the alleged libel is: "He thinks it a great thing to bribe a committee or officers so as to sell a piano. I know that was the case, and also that he tried to bribe a committee to sell a piano to the Degree of Honor." It is true, it is alleged in the complaint that the plaintiff and other members of the committee were authorized to purchase a piano, but the language used in the article clearly imports that the plaintiff and the other members of the committee were bribed to purchase the particular piano mentioned in the article. A "bribe" is defined by Webster's International Dictionary, among others, as follows: "A price, reward, gift, or favor bestowed or promised with a view to pervert the judgment or corrupt the conduct of a judge, witness, voter, or other person in a position of trust." "To give a bribe to a person; to pervert the judgment or corrupt the action of a person in a position of trust by some gift or promise." Undoubtedly it was understood by the members of the Lead City Miners' Union and by the public generally as charging that the plaintiff had received a bribe, gift, or reward which had influenced his judgment, and induced him to purchase the particular piano mentioned in the article. In view of the fact that the plaintiff occupied a responsible position as president of the union, and that he had been placed there by the members thereof to guard and protect their interests, the charge made was calculated to degrade him, to reflect upon his honor and his integrity, and, if true, to show that he was unworthy to fill the responsible position held by him.

Taking this view of the charge made in the article, we are

clearly of the opinion that it constitutes a libel, and that the court below was right in overruling the demurrer.

The order overruling the demurrer is affirmed.