SHERIN, Respondent, v. EASTWOOD et al, Appellants.

(190 N. W. 320.)

(File No. 5111.   Opinion filed October 27, 1922.)

**Libel and Slander—Newspaper Articles Charging and Insinuating Misconduct of City Attorney Held "libel."**

Newspaper articles charging and insinuating misconduct of a city attorney, in authorizing an inadequate circus license fee in violation of his oath of office and duty held libelous; libel being any writing, picture, or sign which derogates from the character of an individual by imputing to him either bad actions or vicious principles or which diminishes his respectability and abridges his comforts by exposing him to disgrace and ridicule.

Appeal from Circuit Court, Codington County; Hon. W. N. Skinner, Judge.

Action by Arthur L. Sherin against George H. Eastwood and another. From order overruling defendants' demurrer, they appeal. Affirmed.

*Case & Case,* of Watertown, for Appellants.

*Sherin & Sherin,* of Watertown, for Respondent.

Appellants cited: Arnold v. Ingraham (Wis.), 138 N. W. 111.

Respondent cited: Hanson v. Temple (Wis.), 185 N. W. 225.

ANDERSON, J. This is an action for libel in which the complaint is, in substance, as follows:

That plaintiff is a resident of the city of Watertown, this state, and has been such for 20 years. That he is a practicing lawyer engaged in a general law practice in said city. That since May, 1915, he has been city attorney of Watertown. That since January 1, 1921, he has been state senator from Codington county. That defendants for many years past were publishers and proprietors of the Watertown Herald, a weekly newspaper published in said city, with a circulation in said city and county and counties adjoining. That on July 14, 1921, defendants, being editors and managers of said newspaper, did willfully, unlawfully, and viciously, with intent to injure plaintiff in his occupation and profession as an attorney at law, and with express malice toward plaintiff, and for the purpose of injuring plaintiff in his occupation and profession, and discredit plaintiff as city attorney aforesaid and interfere with his making a livelihood in said city and county, and for the purpose of destroying the confidence of residents of said city in him as city attorney, and destroying the confidence of residents of said county and state in him as an attorney, and exposing plaintiff to hatred, contempt, obloquy, and cause him to be shunned and avoided by society, did write, print, and publish in said newspaper on said July 14th concerning plaintiff, the following scandalous and malicious libel, in words and figures to-wit:

"Came, Saw and Conquered.

"Genial Advance Agent of Circus Saves Money for Show.
" 'Dogs and Ponies.'

"Adamantine Heart of City Attorney" (meaning this plaintiff)
"Touched by Pathetic Plea?

\*        \*        \*        \*        .\*        \*

"The formalities soon over and his business in the city almost concluded, he waxed friendly, and a bit confidential. 'You know, friend,' quoth he, 'Your city is a winner, but your circus license is a lot too high—$200! Gee! that's a lot of money!' * * * 'But,' quoth he, with a knowing wink, 'I think I can get a better rate than that. I am going up to see the city attorney'" (meaning this plaintiff), " 'and I think I can save some money.' A few conventionalities were passed back and forth as the genial circus man stepped out from the office on his way to the office of the city attorney" (meaning this plaintiff), "and we registered acute incredulity as we thought, 'Huh, that guy will have a fat chance slipping anything over on our city attorney'" (meaning this plaintiff). " * * * Time passed on, about 15 minutes of it, and the advance agent breezed in smiling merrily, a lilting song upon his lips. 'Aha!' we surmised. 'He has been so cruelly treated that he has become slightly balmy; he is off his nut. Boy! page the dippy wagon!' But no, 'twas not so. The man was sane; nay more, he was smiling through fresh dewy tears. Thoroughly inspired by the astounding sight, the writer ventured to inquire how he had come out in his interview with the city attorney" (meaning this plaintiff). "Oh, you know; really—the city attorney" (meaning this plaintiff) "is a nice little chap. I told him about our circus and he said it would be all right to come on in as a dog and pony show; the license is $50, you know.' And with a knowing wink, he passed on and out" (meaning thereby that this plaintiff, as city attorney of the city of Watertown, had corruptly and contrary to his oath and duty as city attorney, entered into an arrangement with the advance agent for the Rhoda Royal Shows, whereby they were permitted to show in the city of Watertown for less than the license fee required by the city ordinance). "Imagine gentle reader the heartrending scene which must have transpired in the office of the city attorney" (meaning this plaintiff), "stern protector of the civic weal sitteth straight at his desk, a light frown upon his noble brow as he thought of various ways and methods by-which-he-might-do-the-city-GOOD. A gentle, timid rap is heard upon the door. The figure at the desk is lost in thought and hears it not. Again the tapping, this time louder and more forceful. The thinker arouses from his deep thought, casts a glance at the door, and in a heavy, sonorous

voice utters the single word, 'Enter!' A heart bowed down answers the summons by injecting itself feebly into the presence. Slightly bolstered up by a two-karat sparkler on the third finger and a headlight on his scarf, the advance agent for the circus mutters with a world of care and woe in his voice: 'For Gawd's sake, mister; have pity on my starving family and let me come in with my circus at dog and pony rates!' The secret was out; there was going to be a circus in town. Lovely days; sweet essence of fragrant squat drops, what an opportunity to bolster up the city funds. With a savage look upon his face, the noble youth answers: 'Never, we must have our pound of flesh. Though you were an Uncle Tom's Cabean show, yet you must needs pay the price—we need the money!' (the last phrase coming forth snappily, 'We need the money'—just like that). 'But,' began the stranger—— 'But me not buts, sir-raah! You must pay by the nose.' 'Ah, your nose knows jack when it sees it,' saith the agent, becoming slightly addled in his metaphor but beginning to see that he was up against hard-boiled proposition. Calling up his entire reserve, however, he threw out a barrage of tears and lamentations and as he murmured, in tones of utter anguish, 'Where will they sleep that night?' the miracle happened. Bounding to his feet, the city attorney" (meaning this plaintiff) "lifted the drooping figure to its feet. 'Say no more, my friend; my goodness, I can't stand such terrible grief. Listen, well: Dogs and ponies can exhibit in our town for the modest sum of $50 per diem; tell me have you a pony? Have you a canine? Yes? Well, then, come hither and let me weep a moment upon your shoulder; your grief has quite unnerved me. Under the circumstances (holding his hand palm upward, as if to spread his benediction upon his visitor) I think I can get you by for the fifty" (meaning thereby, and intending to convey and conveying the meaning that this plaintiff, as city attorney of the city of Watertown, had accepted a bribe from the advance agent for the Rhoda Royal Shows for the purpose of securing for them a license for showing in the city of Watertown for less than the license fee prescribed in the city ordinance). "A sweet look of perfect understanding passed between them; a needy stranger within our gates and a good Samaritan" (meaning this plaintiff). "As the circus man passed from the room the city attorney" (meaning this plaintiff), "steady-

ing himself against his feet, gazed compassionately and long at the solemn doorway. A perusal of the treasurer's books reveals the fact that a $25 license fee was paid by the circus management. Ain't nature wonderful" (meaning thereby and intending to convey and conveying the meaning that this plaintiff, as city attorney of the city of Watertown, had corruptly and contrary to his oath and duty as city attorney, embezzled and appropriated to his own use the sum of $25 claimed by the defendants to have been paid to the plaintiff by the Rhoda Royal Shows for a license in the city of Watertown, in addition to the $25 license fee turned over to the city treasurer).

That by reason of said false, malicious and defamatory publication, plaintiff has been injured in his profession as an attorney and his standing as city attorney, and in the estimation of residents outside of said county. That said articles were written and published concerning plaintiff for the purpose of exposing him to contempt, ridicule, and obloquy, and cause him to be shunned and avoided by all good society.

For second cause of action, after setting forth the preliminary, in substance, as stated in the first cause of action, plaintiff alleges the publication by defendants on July 21, 1921, of another article in the same paper and that the same was published willfully and maliciously, with intent to injure plaintiff in his occupation and profession, with express malice toward plaintiff, and with purpose of injuring him as city attorney of said city, and for the purpose of destroying confidence of the people of said city and adjoining counties in him as a public official, and to expose him to hatred, contempt ,and ridicule, and cause him to be shunned; that they wrote, composed and printed and published in said newspaper on the editorial page thereof the false and malicious libel following:

"June 25, in 1918, when A. T. Hopkins was mayor, an ordinance regulating circuses and setting the price of licenses was passed. The ordinance is known as ordinance B-38 and regulates the price as follows: 'If admission fee is more than fifty cents then $300 is fixed as the license fee. If twenty-five cents to fifty cents is charged, then the fee is fixed at $250 per day. If 25 cents per person is charged, then a fee of $50 is fixed. This being the lowest legal rate.' However the Rhoda Royal Crcus, which showed here Wednesday of last week, was given a license

by the city auditor, 'Miss Brownie Mather, for $25, presumably under the order of City Attorney Arthur L. Sherin. About three weeks prior to the show date, the advance agent of the Rhoda Royal Circus visited the Herald office and asked for advertising rates for readers and display advertising, stating he was not ready to sign up unless he could get a license for less than the city clerk asked, which he stated was $200. The Herald editor told him to go to Mayor Hagna and refrain from mentioning the Herald or Eastwoods' in any way, and that we were sure he would send him to A. L. Sherin, city attorney" (meaning this plaintiff). "Again he must not mention having met the Herald proprietors and he could in all probability fix it with Mr. Sherin at a minimum price" (meaning thereby and intending to convey and conveying the meaning that this plaintiff as city attorney, could be fixed at a minimum price to violate his oath of office as city attorney of the city of Watertown, and that for a minimum price the advance agent for the Rhoda Royal Shows could fix the city attorney so as to secure his license for less than the fee fixed by said city ordinance). "He left that morning, returning that afternoon to sign advertising contracts, and stated in the presence of witnesses that the license cost him fifty dollars. The article appearing in the Herald last week was based on that information, which we had no reason to believe was untrue. Later we visited the city clerk or auditor's office, who refused to tell upon whose authority the license was issued, but was told the price paid was $25. This license also carried a permit for hawkers or peddlers to sell goods on the streets of Watertown. Now if a farmer wishes to come into Watertown to sell a part of a beef he kills, he has to put up a fee of $5 per day to peddle the meat. But traveling circus vendors can be given a permit for $25 for showing a three-ring circus and allowing a half dozen men to howl their way through the streets selling their merchandise. Is it fair? Is Arthur Sherin hired to enforce the laws made by the city council, or break them? Who is running the city of Watertown, Mayor Hagna and the city council, or Arthur L. Sherin, the city attorney?" (meaning this plaintiff). "Miss Mathers says she would not give the license without authority. Who gave her authority to put the price at $25. If the Rhoda Royal agent told the truth about paying Sherin $50 what became of the other $25?" (meaning thereby and in-

tending to convey and conveying the meaning that this plaintiff
as city attorney of the city of Watertown had received from the
Rhoda Royal agent the sum of $50 in connection with the grant-
ing of the license for the Rhoda Royal Shows and that this plain-
tiff only turned over to the city auditor or city treasurer the sum
of $25,. and that the plaintiff as city attorney had embezzled and
appropriated to his own use the sum of $25, contrary to his oath
and duty as city attorney of the city of Watertown). "If Sherin
ordered the license given at $25, what authority did he have for
breaking the ordinance provisions, the minimum price being $50?
Isn't it about time the people of this city were waking up to the
fact that things are being run in a slipshod manner, graft or no
graft? Is it up to the city council to investigate this matter? If
the city authorities thought the show was so small and insignificant
that it should pay a license fee of only $25, then why did they not
warn the people that the circus folks were advertising misrepre-
sentations? The Rhoda Royal people charged seventy-five cents
for admission to adults, and they represented a three-ring circus.
The ordinance B-38 fixes this price at $300, yet $25 was paid into
the city treasury as a license fee. Why?" (meaning thereby and
intending to convey and conveying the meaning that this plaintiff
as city attorney of the city of Watertown had corruptly and for
a bribe and contrary to his oath and duty as city attorney of the
city of Watertown, paid into the city treasury, the sum of $25
for a license for the Rhoda Royal Shows).

By reason of said publication plaintiff has been injured in
his profession and in his standing as city attorney and as a public
official of said city and in the estimation of people of the counties
outside of said county to whom such publication came. That said
article was published for the purpose of exposing plaintiff to
hatred, contempt, and ridicule, and to cause him to be shunned.
That more than three days prior to commencement of this action
plaintiff caused notice to be served upon defendants to retract the
statements aforesaid, but defendants have never made any retrac-
tion. That by reason of publication of said articles plaintiff has
been damaged in the sum of $25,000, for which he prays judg-
ment.

To the complaint defendants interposed a demurrer to both
the first and the second cause of action, on the ground that the

complaint does not set forth facts sufficient to constitute a cause of action. This demurrer was by the trial court overruled.

Does the article published constitute libel? Starkie on Slander, vol. 1, p. 169:

"Upon the whole it may be collected that any writings, pictures or signs, which derogate from the character of an individual, by imputing to him either bad actions or vicious principles, or which diminish his respectability and abridge his comforts, by exposing him to disgrace or ridicule, are actionable, without proof of special damage; in short, that an action lies for any false, malicious, and personal imputation, effected by such means, and tending to alter the party's situation in society for the worse."

Quoted with approval by this court in Barron v. Smith, 19 S. D. 50, 101 N. W. 1105. From Parmelee v. Nottage, 119 Minn. 351, 138 N. W. 312, 42 L. R. A. (N. S.) 870, this court quoted with approval the following:

"A charge need not be made directly; indeed, the venom and sting of an accusation is usually more effective when made by insinuations. The floating calumny which each reader may affix to any and every official act which his aroused suspicion may lay hold of is capable of inflicting graver injury and injustice than a direct, specific charge, which may be squarely met and refuted, if untrue."

In Hutchins v. Page, 75 N. H. 215, 72 Atl. 689, 31 L. R. A. (N. S.) 132, it was held:

That "a tax collector who, in addition to posting the notices of sales of delinquent taxes, required by law, publishes the fact of delinquency in newspapers for the purpose of maliciously proclaiming to the public that the taxpayer was delinquent, and not in the belief that such advertisement was essential, * * * is answerable for libel, although the statement was in fact true."

Here the court said:

"It was not his duty [the collector] to otherwise publish the fact, unless he thought such publication was essential to the success of the tax sale. If he did not so believe, but, on the contrary, used this occasion to maliciously proclaim in a public manner that the plaintiff had not paid his taxes, there is neither legal nor ethical reason why an action should not lie for the damage caused by the malicious and unwarranted act."

Considering this entire complaint and applying the law thereto as we believe it to be, we are persuaded that the publication complained of is libelous, and that the complaint states a good cause of action against the defendants.

The order of the lower court overruling defendants' demurrer is affirmed:

Note—Reported in 190 N. W. 320. See American Key-Numbered Digest, Libel and Slander, Key-No. 10(3), 25 Cyc. 243, 244, 25 Cyc. 346, 350, 17 R. C. L. 355, note 18.