EMPIRE PRINTING COMPANY, a Corporation, Appellant,

v.

Henry RODEN, Ernest Gruening and Frank A. Metcalf, Appellees.

No. 15052.

United States Court of Appeals Ninth Circuit.

June 10, 1957.

H. L. Faulkner, San Francisco, Cal., for appellant.

Buell A. Nesbett, Anchorage, Alaska, for appellees.

Before DENMAN, Chief Judge, POPE, Circuit Judge, and MURRAY, District Judge.

POPE, Circuit Judge.

The appellees, as plaintiffs below, each filed a separate action against Empire Printing Company, appellant, for defamation as a result of a publication which appeared in the Daily Alaska Empire, a newspaper published by appellant at Juneau, Alaska. The cases were consolidated for trial and tried to a jury which returned verdicts awarding each appellee $1.00 compensatory damages, and $5,000 punitive damages, and appellant appeals.

At the time of the publication involved, appellee Gruening was Governor of Alaska, appellee Roden was Territorial Treasurer, and appellee Metcalf was Territorial Highway Engineer, and the three together constituted the Territorial Board of Road Commissioners.

Prior to May, 1951, there had been operated under private ownership a ferry, the "Chilkoot", between Haines and Juneau, Alaska, which closed a gap in the highway between these two points. In May, 1951, the private owners of this ferry announced to Territorial officials that because of increased operating costs they did not intend to operate the ferry during the season of 1951. Faced with the abandonment of the ferry which closed the 65 mile water gap between Juneau and the highways of Alaska and the United States, the appellees, acting as the Territorial Board of Road Commissioners, purchased the ferry Chilkoot to operate it as part of the Territorial Road system. During the 1951 season, the operating expenses of the ferry were paid by voucher approved by the Territorial Auditor out of the Territorial treasury from the funds earmarked for roads, harbors, etc. Receipts from the operation of the ferry went to the Treasurer and into the general fund of the Territory.

This method of operation, which was followed during the 1951 season, proved unsatisfactory in several respects. In the first place, the processing of Territorial vouchers, issued in payment of operating expenses of the ferry, took considerable time, and many of the expenses were payable immediately; and secondly, because while the expenses of the ferry were paid out of the road and harbor appropriations, the income from the ferry went into the general fund of the Territory, which resulted in a depletion of the road and harbor fund in an amount disproportionate to the net cost of operating the ferry.

Because of these difficulties, appellees, acting as the Territorial Board of Road Commissioners, met with the Attorney General of the Territory in June, 1952, before the commencement of the 1952 ferry season, and devised a plan for the operation of the ferry by which revenue from it could be used to defray operating expenses. Under this plan receipts from the ferry operation were deposited in a bank account known as the "Chilkoot Ferry" account, and the only person authorized to draw funds from said account was the purser of the ferry, one Robert E. Coughlin. Funds were withdrawn by said Coughlin in payment of expenses of operating the ferry. This method was followed in the 1952 operations of the Chilkoot ferry.

The publication in question appeared in the appellant's newspaper "Daily Alaska Empire" of September 25, 1952, and gave the above mentioned details of the ferry operation by appellees. Almost the entire front page of that issue was devoted to the so-called "special ferry fund", and is too voluminous to be included in its entirety in this opinion. However, the headline, in black type an inch and a quarter high, and extending

across the entire eight columns of the front page, read "Bare 'Special' Ferry Fund". Beneath that headline was another smaller headline in ⅝ inch high black type five columns wide reading "Reeve Raps Graft, Corruption". This latter heading dealt with a one column story at the extreme left of the page regarding a speech made by a political candidate named Robert Reeve, and, so far as its text is concerned, it had nothing to do with the ferry fund or appellees. Immediately next to the one column story and directly under the headline "Reeve Raps Graft, Corruption" was a photograph of a check drawn on the "special" ferry fund. Beneath the photograph of the check was a two column editorial entitled "Start Talking Boys" which dealt with the special ferry fund. To the right of the page and as a sub-headline to the main headline three lines deep and in type one-half inch high, was a statement "Gruening, Metcalf, Roden Divert 'Chilkoot' Cash to Private Bank Account". In the story which appeared under this headline was the statement, "The case closely parallels that of Oscar Olson, former Territorial Treasurer who is now serving a prison term at McNeil Island Penitentiary for violating the law in the receipt and disbursement of public funds." In the editorial headed "Start Talking Boys", there was this additional reference to Oscar Olson: "Oscar Olson sits today in his prison cell, dreaming of the days when he thought Territorial laws were only for the underlings."

It was the above quoted headlines and portions of the publication which appellees alleged constitute the libel. Appellant pleaded as affirmative defenses truth, fair comment and privileged criticism.

In this court the appellant states its position upon the principal issue between the parties as follows: "Appellees claim that the articles could be interpreted as meaning that the appellant was charging the appellee with stealing public funds or converting them to their own use, whereas there is nothing of that nature contained in the publication."

At the time here in question, § 65–5–63, A.C.L.A.1949, provided as follows with respect to the offense of embezzlement of public money:

"Embezzlement of public money. That if any person shall receive any money whatever for said Territory or for any county, town, or other municipal or public corporation therein, or shall have in his possession any money whatever belonging to such Territory, county, town, or corporation, or in which said Territory, county, town, or corporation has an interest, and shall in any way convert to his own use any portion thereof or shall loan, with or without interest, any portion thereof, or shall neglect or refuse to pay over any portion thereof as by law directed and required, or when lawfully demanded so to do, such person shall be deemed guilty of embezzlement, and upon conviction thereof shall be punished by imprisonment in the penitentiary not less than one nor more than fifteen years, and by fine equal to twice the amount so converted, loaned, or neglected or refused to be paid, as the case may be."

§ 7–1–9 of the same Code defined embezzlement when committed by the Treasurer of the Territory of Alaska in substantially the same terms as those used in the section just quoted,[1] and con-

---

[1]. "§ 7–1–9. Embezzlement: Penalty. If the Treasurer of the Territory of Alaska, or any person exercising the duties of that office, shall fail, neglect or refuse, to account for or pay over, all moneys in his hands as said Treasurer in accordance with law, or shall unlawfully convert to his own use in any manner whatever, or to the use of another not lawfuly entitled thereto, or use by way of investment in any kind of property, or loan without authority of law, any portion of the public money intrusted to him for safe keeping, transfer or disbursement, or unlawfully convert to his own use, or to the use of another not entitled thereto, money or other property which may come into his hands by virtue of his office he shall

cluded by providing that upon his conviction of such offense the Treasurer should be subject to the same punishment as otherwise provided in the laws of Alaska for the crime of embezzlement. Both of the sections just referred to deal with embezzlement of public funds. Other sections of the Alaska Code define and provide for the punishment of embezzlement by various other classes of persons.[2] Embezzlement, as defined in these latter sections, is the crime as that term is more commonly understood. In the case of embezzlement under those sections there must be a "wrongful conversion", a "fraudulent conversion", or "conversion with intent to defraud."

§ 12–2–1, A.C.L.A.1949, also provides with respect to public officials receiving public money as follows:

"Every office, board, commission or bureau authorized to collect or receive any fees, licenses, taxes or other money, and every office, commission or bureau of the United States or other authorized agency, authorized to collect any fees, licenses, taxes or other money, belonging to this Territory, shall account for and pay such fees, licenses, taxes or other money, less any fees he may be entitled to under existing law, to the Territorial Treasurer at least once each month and the same (shall) be covered into the general fund."

Appellant calls attention to those portions of § 65–5–63, quoted above, which provided that the offense of embezzlement of public money may be committed not only when the official shall "convert to his own use any portion thereof", but also when he "shall loan * * * any portion thereof", or when "he shall neglect * * * to pay over any portion thereof as by law directed and required." Its position is that the appellees did in fact fail to pay over the receipts from the ferry operation to the Territorial Treasurer as required by § 12–2–1; that this amounted to a neglect or refusal to pay over such funds as by law directed within the meaning of § 65–5–63 quoted above. It contends that the published article stated no more than that, namely, that the appellees had entered into an arrangement whereby money belonging to the Territory was put into a special fund and not paid over to the Treasurer; that since this is all that the newspaper article said, the publication was not actionable primarily because it was true.[3]

The appellees' actions proceeded upon their theory that the published articles went far beyond the mere statement that

---

2. be deemed guilty of the embezzlement of so much of the money or property as is thus taken, converted, invested, used, loaned, or unaccounted for, and upon conviction thereof he shall be subject to the same punishment as is otherwise provided in the laws of Alaska for the crime of embezzlement."

2. "§ 65–5–61. Embezzlement by employee or servant. That if any officer, agent * * * shall embezzle or fraudulently convert to his own use, or shall take or secrete with intent to embezzle or fraudulently convert to his own use * * *.
   "§ 65–5–62. Embezzlement by bailee: Indictment. That if any bailee, with or without hire, shall embezzle, or wrongfully convert to his own use, or shall secrete, with intent to convert to his own use * * *."
   "§ 65–5–65. Embezzlement by trustee. That if any person, being the trustee of any property for the benefit of another, or for any public or charitable use, shall, with intent to defraud, by any means convert the same or any portion thereof to his own use or benefit * * *."
   "§ 65–5–66. Embezzlement by banker, broker, etc. That if any person, being a banker, broker, merchant, attorney, or agent, and being intrusted with the property of another, shall, by any means, with intent to defraud, convert the same, * * *."

3. It is also argued that viewed in this light the articles could not be regarded as libelous per se, since language cannot be so construed unless it "falsely impute the commission of a crime". The argument is that the articles as printed were not false because they merely related circumstances that actually occurred with respect to the creation of the special fund and the failure to pay it into the treasury.

appellees had set up a special fund which was not paid over to the Territorial Treasurer;—that its actual sense and meaning to the reading public was that they, the appellees, had been guilty of the crime of embezzlement as that crime is commonly understood in that they had been guilty of wrongful conversion of public funds to their own use. Appellees say that the reading public must have understood the articles when taken together and read as a whole as charging the crime of embezzlement involving private profit and moral turpitude, primarily because of the statement that this case paralleled that of Oscar Olson who was again referred to in the editorial, which described Olson, as sitting "in his prison cell."

█ Olson, as the published article indicated, was a former Territorial treasurer who was convicted of embezzlement upon an indictment under § 7-1-9 above referred to. Judgment had been entered upon his plea of guilty and he had been sentenced to a term at McNeil's Island Penitentiary. His case, it may be assumed, was one well known in the Territory. The public funds had been converted to his own use. The record here shows that he embezzled some thousands of dollars which he put into his own pocket and spent. Appellees say that these articles in substance were calculated to convey to the reader, and did create in the mind of the reader, the thought that these appellees had been guilty of a like or similar offense. This principal issue was submitted to the jury by an instruction which stated as follows:

"The Court does not here declare or intend to indicate to you whether or not the crime charged, imputed to the plaintiffs, or intended to impute to the plaintiffs, the wrongful theft or misappropriation of public funds. The plaintiffs alleged that such words, together with other references to the Oscar Olson case, and imputations of graft and corruption, impute to them the crime of embezzlement as that crime is commonly understood, that is, the wrongful conversion of public funds entrusted to plaintiffs to their own use, which accusation is admittedly untrue. The defendant denies that there was any accusation of theft of public funds, or any such imputation intended, and contends that the violation of law charged referred only to unlawful receipt and disbursement of public funds, which it alleges to be true. This is a question of fact for the jury to determine, from a consideration of all of the evidence in the case, and from a careful consideration of the publications in their entirety, including headlines, and any reasonable imputations or deductions arising therefrom."

We think that this instruction of the court and the submission of this question to the jury was proper. In Washington Post Co. v. Chaloner, 250 U.S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987, it was stated: "A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item, including display lines, should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read."

█ Here was a case in which the plaintiffs asserted that what was said, in the light of the way it was said, and the surrounding circumstances, was that plaintiffs had been guilty of the crime of embezzlement involving private profit

and moral turpitude; that is to say, as that crime is commonly understood. The first question was for the judge: whether the publication proven was capable of that meaning. If it was, then it was for the jury to determine whether the publication was in fact so understood.[4] And if it was so understood, no proof of the truth of a lesser, more innocuous meaning, could make out a defense.

And so it was proper for the court to tell the jury, as it did, that if they should find that the charge in the publication was the serious one, which the appellees claimed it was, then "the defendant must show, to justify the truth of such publication, not only that plaintiffs took the funds accruing from the operation of the ferry, deposited them in a separate account, and paid operating expenses out of such account without vouchers approved by the Auditor, but defendant must also show by a preponderance of the evidence that plaintiffs handled the money wrongfully and fraudulently and with a criminal intent to convert such to their own use." The jury found for the plaintiffs, appellees here, upon these issues.

■ In our view the record warrants the jury's finding that the publication was calculated to charge the more serious and more degrading type of offense, and that the attempted justification of truth was not sustained.

Plainly here there was plenty of room for a finding that the publication charged, and that it was well calculated to charge, embezzlement involving theft and conversion to appellees' own use. Defamation can be accomplished in a multitude of ways, and the manner in which the front page of defendant's newspaper was made up on the occasion here in question, could well be regarded by the jury as a deliberate defamation by indirection, insinua-

tions and associations, even if a direct and categorical charge were lacking. The jury could well infer that the readers of that newspaper were given to understand by what they read that these appellees had been guilty not merely of a violation of statute but of embezzlement under circumstances of extreme infamy and depravity. "A charge need not be made directly; indeed, the venom and sting of an accusation is usually more effective when made by insinuations. The floating calumny which each reader may affix to any and every official act which his aroused suspicion may lay hold of is capable of inflicting graver injury and injustice than a direct, specific charge, which may be squarely met and refuted, if untrue." Sherin v. Eastwood, 46 S.D. 24, 190 N.W. 320, 323.

■ What a newspaper article actually says or carries to its readers must be judged by the publication as a whole. The headlines alone may be enough to make libelous per se an otherwise innocuous article. Gustin v. Evening Press Co., 172 Mich. 311, 137 N.W. 674.

An article may become libelous by juxtaposition with other articles or photographs. Zbyszko v. New York American, 228 App.Div. 277, 239 N.Y.S. 411. The jury had the right to read this publication with an eye upon the question of what ideas it was calculated to bring to the average reader, and it could well believe that the publication charged these plaintiffs with guilt of the most reprehensible kind and with personal dishonesty, corruption and moral turpitude.

■ Immediately under the page-wide scare headline "Bare 'Special' Ferry Fund" appear two sets of sub-headlines in heavy black type three-fourths of an inch in height. On the lefthand side, and five columns wide, is the heading "Reeve Raps Graft, Corruption". Immediately

---

4. Restatement of Torts, § 614: "(1) The court determines whether a communication is capable of a defamatory meaning. (2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient."

And see Prosser on Torts, 2d Ed., § 92, p. 581: "It is for the court in the first instance to determine whether the words are reasonably capable of a particular interpretation; it is then for the jury to say whether they were in fact so understood."

under this line and dovetailing with it is a photostat copy of one of the Chilkoot ferry checks. The fact that the text of the article under the heading relating to graft and corruption refers to a wholly different matter is a circumstance which the jury had a right to consider, but it did not compel them to ignore the very possible purpose sought in weaving all these headlines together, especially in view of the substantial evidence of actual malice on the part of the publishers. The jury could conclude that the headline was placed where it was for its effect upon the reader in connection with the other headlines. It was immediately opposite the headline, in comparable type reading "Gruening, Metcalf, Roden Divert 'Chilkoot' Cash to Private Bank Account." The two column wide editorial on this same page immediately below the reproduction of the check, is headed, 'Start Talking, Boys". Not only is that heading of the editorial an apparent simulation of the way a detective would address a crook in a cops and robbers movie, but it has sarcastic comments upon other "deals" with which Gruening had been connected, and whose defense of a named former proceeding is referred to as one which "still rings stridently in the ears of all honest Alaskans." Defamation may be by irony or ridicule. See Prosser, § 92, pp. 576, 580.

The reference in the right hand headline to the diverting of funds to a "private" bank account fits into what the jury could find to be a calculated creation of inferences of graft and corruption. The casual reader of this page might thus be given the impression that the diversion is to "private uses."

Most important in this connection is the reference to Oscar Olson. A direct reference to the Olson case is made in the news account and again in the sarcastic reference in the editorial.[5] It seems a fair interpretation of the publication that in charging that this case "parallels" that of a dishonest territorial treasurer who was caught and sentenced to serve time in McNeil Island Penitentiary for converting territorial funds to his own use, the newspaper was charging appellees with that kind of an offense.

Since the jury could rightly find that such was the meaning of the newspaper publication, it follows that it could also find, under the court's instruction quoted above, that the defense of truth was not made out. "The truth, when relied on in justification of a libel, must, to constitute a complete defense, be as broad as the defamatory accusation; and so the proof of truth of a part only of a charge will not amount to a complete defense." Register Newspaper Co. v. Stone, 102 S.W. 800, 801, 31 Ky. Law Rep. 458, 11 L.R.A.,N.S., 240. "The truth which is admitted as a defense in such an action as this is the truth of the alleged words in substance and in fact, in the sense in which they were used and intended to be understood, or were reasonably understood in accordance with the usual construction and common acceptation of the meaning of the words as used, in the light of all the surrounding circumstances." White v. White, 129 Va. 621, 106 S.E. 350, 352. There is no claim whatever that any of the appellees in what they did with respect to the special fund were guilty of any personal dishonesty or made any individual profit, or received anything to their own use. That is conceded.

This brings us to a consideration of various specifications of error dealing with sundry rulings of the trial court which appellant asserts were erroneous and prejudicial. A substantial number of these specifications failed to conform with the requirements of Rule 18 (2) (d) of this court, 28 U.S.C.A. which provides that: "When the error alleged is to the charge of the court, the specification shall set out the part referred to totidem verbis, whether it be in instructions given or in instructions refused, together with the grounds of the objections urged at the trial." In general this court has not

---

5. "Oscar Olson sits today in his prison cell dreaming of the days when he thought that Territorial laws were only for the underlings."

been inclined to be strict in the enforcement of that rule, particularly when the briefs sufficiently disclose the point which the appellant is endeavoring to make. Here it must be said that appellant's disregard of this rule has made it exceedingly difficult to ascertain what appellant is trying to say. Nevertheless we propose to deal with each specification or attempted specification as stated.

■■■ Appellant complains that the trial court held and ruled that there was no criminal penalty for such acts as appellees performed in respect to the setting up of the special ferry fund. Since the jury by their verdict have approved appellees' version of the meaning of the newspaper publication and have in effect found that it charged appellees with embezzling funds to their own use, as did Oscar Olson, the question as to whether setting up the Chilkoot ferry fund was also subject to criminal punishment would appear to be unimportant. But in any event, appellant is mistaken as to the trial court's ruling upon this point. What the court said as to this matter was contained in instruction No. 5 which fully explained the provisions of § 65–5–63 and § 7–1–9, above referred to and then left it to the jury to determine whether the actions of the plaintiffs relating to the ferry fund were or were not illegal.[6] We find no occasion to consider whether the court should have determined this question itself rather than leaving it to the jury, for no exception was taken to the action of the court in this regard. Rule 51 Fed. Rules Civ. Proc., 28 U.S.C.A.

Two of the specifications relate to the cancelled checks drawn on the special ferry fund and to the use of those funds in the operation of the ferry. At the trial appellant introduced in evidence the certificates of the Territorial Treasurer, the Territorial Secretary, and the Director of Finance, stating that they had each searched the records of their office and did not find in such offices any of the ferry fund checks. These certificates were dated in October and November, 1955, shortly before the trial of the action began. Appellant requested an instruction to the jury that the appellees had not produced the records of the ferry fund or its checks at the trial and reciting that it was the duty of the plaintiffs, these appellees, to have seen that these papers were filed in the proper office, and that the destruction of such papers would constitute a crime.

■■■ It is plain that such an instruction would be wholly improper; the certificates that the checks were not then in the several offices mentioned were dated long after the appellees had left office, the terms of two of them having expired some two and one-half years previously. The suggestion attempted in the proposed instruction that appellees were responsible for the absence of the checks is wholly unwarranted by the facts. But more significantly, the disposition of the checks or the funds had no relation whatever to the alleged libel. Nothing in the publication concerned disposition or loss of the checks or their destruction and to invite the jury to speculate as to whether some one had destroyed the checks would be a most improper invitation to consider collateral and irrelevant matter.

The appellants offered to prove that there was a shortage in the funds used to operate the ferry and they object to the trial court's exclusion of this evidence. The appellants would infer from the shortage an act of criminal misconduct by the appellees and thus establish the truth of the charge that they were guilty of the crime of embezzlement as that crime is commonly understood.

While the inference of misconduct might be permissible from mere proof of a shortage, there is nothing in the offer of proof which would connect the misconduct with the appellees, and it is clear

---

**6.** The court charged: "By this the Court does not intend to comment in any way as to whether or not the actions of the plaintiffs relating to the 'Chilkoot' ferry fund were or were not illegal, which is a matter for the jury; but it is the intention of this instruction only to declare to you the remedy in case there may exist any such illegality."

from the evidence that they never actually handled any of the money. Therefore, as the attorney for the appellants recognized, for this evidence to be relevant the appellees would have to be vicariously liable criminally for the misconduct of their agents who actually ran the ferry.

But under the facts here present appellees could not be vicariously guilty of the crime of embezzlement in the common sense. Generally speaking the doctrine of *respondeat superior* has no application in criminal law; State v. Moss, 95 Or. 616, 182 P. 149, 188 P. 702, 705; United States v. Food and Grocery Bureau of Southern California, D.C., 43 F.Supp. 966, 971; Sayre, Criminal Responsibility for Acts of Another, 43 Harv. L.Rev. 689, 702. The reason for this is that except in rare instances the element of intent is a requisite portion of the proof of a criminal charge and cannot be inferred from the mere fact of the agency. Certainly embezzlement as that crime is commonly understood is a crime of that character, and in which proof of specific intent is required. As the Supreme Court said in Morissette v. United States, 342 U.S. 246, 260, 72 S.Ct. 240, 248, 96 L.Ed. 288:

> "Stealing, larceny, and its variants and equivalents, were among the earliest offenses known to the law that existed before legislation; they are invasions of rights of property which stir a sense of insecurity in the whole community and arouse public demand for retribution, the penalty is high and, when a sufficient amount is involved, the infamy is that of a felony, which, says Maitland, is ' * * * as bad a word as you can give to man or thing.' State courts of last resort, on whom fall the heaviest burden of interpreting criminal law in this country, have consistently retained the requirement of intent in larceny-type offenses."

Accordingly, we think the trial court was correct in excluding the proffered proof of loss of funds in the operation of the ferry. There was no offer or attempt to show that the plaintiffs personally knew about or authorized the alleged misappropriation. Hence the offered evidence was wholly irrelevant to prove the truth of the accusation that the plaintiffs embezzled funds in the manner in which the jury has found the publication charged.

Another specification of error relates to the language of § 65-5-63, quoted above, which provides that a person in the possession of public money violates that section if he "shall loan, with or without interest, any portion thereof." Appellant attempts, again without complying with this court's rules, to specify error of the court in instructing that the deposit of funds in a bank subject to be withdrawn by check does not constitute in law a loan of such funds. Apparently the argument is that since the legal relationship between a bank and its depositor is that of debtor and creditor, the mere deposit of the ferry funds in a bank would be a loan in violation of the statute.

Even if appellant were right in this assertion, and if that instruction ought not to have been given, it is plain that it could not be prejudicial for here it is conceded by all parties that these ferry funds were not paid to the Territorial Treasurer as they should have been. Whether there was a technical loan to the bank where they were deposited would therefore be of no important significance. However, it is our opinion that the court's instruction was a correct one. It is clear that when the Territorial legislation prohibited the making of loans it did not intend that mere deposits in a bank should be included within that classification.

The court admitted in evidence over the objection of the appellant a portion of a letter which had been written to the editor by one of its writers and published by the newspaper. It referred to the publications here asserted to be libelous and stated that when the writer read them he was caused to think that the Governor [Gruening] was a "dishonest, misappropriating, unworthy man." We think it doubtful if this should have been

received notwithstanding the appellant's publication of the letter would be tantamount to admission that such a communication had resulted from the original articles. If the testimony of witnesses may be received for the purpose of disclosing how the reading public actually understood a newspaper story, we think it would be the better rule to require such reader witnesses to be produced to testify, thus subjecting them to cross-examination. However, the receipt of this single item of evidence cannot be said to be so prejudicial as to call for a new trial.

In a so-called specification which assigns error in refusing to give 22 different instructions requested by the appellant, the appellant refers to the proposed instructions only by number, and en masse, not otherwise describing or identifying them. This is a gross disregard of the requirements of our rule and we are not required to consider such requested instructions or the refusal to give them; nevertheless, we have examined them and we find no merit in the complaints respecting any of them. Some of the instructions listed are peremptory in character and are the equivalent of a command for a directed verdict. Others merely express a view of the law diametrically opposed to that contained in the proper instructions of the court which we have previously quoted. Some of them bearing upon the defense of fair comment and privilege are no different than the instructions given upon those questions by the court itself. We find it sufficient to say that the court's charge to the jury, taken in its entirety, fairly presented to the jury the issues to be determined by it.

The verdicts of the jury awarded punitive damages in substantial amounts, but the record contains a mass of evidence disclosing express malice on the part of the appellant, which, if believed by the jury, well warranted the verdicts returned. We note no substantial error in the record and accordingly the judgment in the consolidated cases in favor of each of the appellees and against the appellant is affirmed.